Argued and submitted December 21, 1979, reversed and remanded for trial April 14, reconsideration denied May 22, petition for review denied September 3, 1980 (289 Or 587)

## STATE OF OREGON,
*Appellant,*

*v.*

## WILLIAM LOUIS FRAME,
aka Thomas Eugene Frame,
*Respondent.*

## (No. C 78-07-11366, CA 14007)

609 P2d 830

Jan P. Londahl, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

David L. Slader, Portland, argued the cause and submitted the brief for respondent.

Before Tanzer, Presiding Judge, and Thornton and Campbell, Judges.

THORNTON, J.

## THORNTON, J.

Defendant was indicted for theft in the first degree, ORS 164.055.

The state appeals from an order of the trial court granting defendant's pretrial motion to suppress a quantity of allegedly stolen property seized during a search of defendant's house. We reverse.

At the pretrial suppression hearing, the state introduced the following evidence:

Defendant was employed as a security guard by a private firm in the business of providing guards for hire.

On July 17, 1978, defendant's wife, Kathleen Frame, went to the office of defendant's employer and spoke with the district manager, Mr. Palioca. She told Mr. Palioca that defendant had brought home numerous household items that she believed to be stolen. Mr. Palioca then telephoned the police, who came to his office. Mrs. Frame then repeated her story to Detectives Roe and Mattoon and described the items and their location in the house. The detectives requested her permission to go to the house to retrieve the items, which she granted. Mrs. Frame gave Roe and Mattoon the key to the house so that they could enter in case defendant was not home. She also told the detectives that defendant might have a gun at the house, that he had been previously convicted of armed robbery[1] and that he might react violently. Mrs. Frame declined to go to the house with the detectives because she was afraid of defendant. At Mrs. Frame's request, Roe and Mattoon looked through her car, in which defendant had brought home the household items that day, and removed various items Mrs. Frame was certain did not belong to defendant. The detectives confirmed that there had been a burglary the night before at the

---

[1] There is evidence in the transcript that this information about defendant's prior criminal record was inaccurate.

business defendant had been hired to guard and made a list of the items taken. They then arranged for two deputy sheriffs to meet them and went to the Frame residence.

When they arrived at defendant's house, Detective Roe and Deputy Carmody walked to the front door, while Detective Mattoon and Deputy Kelly went to the rear door. As Roe approached the front door, he saw someone in the living room. He rang the bell or knocked and defendant opened the door. Roe explained that they were there to talk about a police matter, and defendant invited them into the living room. Roe then told defendant that he was under arrest for theft, handcuffed him, and read him *Miranda*[2] warnings from a rights notification card. Defendant said that he understood these rights. Roe informed defendant about his meeting with Mrs. Frame and Mr. Palioca and that the police had permission from Mrs. Frame to search the house and told defendant that the police were going to recover the items. Without requesting defendant's consent to enter any part of the house other than the living room or to search the house, Roe "asked him if he would assist us, and he said no; he would rather not say anything or do anything." While Roe and Frame were talking, Deputy Carmody walked through the house and opened the rear door for the other two officers. It is possible that after entering the house the two officers searched the living room for a weapon. The police then proceeded for the next two hours to remove approximately 80 items from the kitchen, bedroom and a storage attic, where Mrs. Frame had indicated they would be. Defendant, who was removed from the house during the search and taken to the booking facility, never expressly objected to the search; neither did he volunteer his consent. Throughout the episode, defendant was "very cooperative" and "not belligerent."

---

[2] *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966).

The trial court made the following pertinent findings of fact, which are not challenged and which are all supported by the evidence. The officers were proceeding based on the consent to search given by Kathleen Frame. Mrs. Frame, by her consent, did not intend to give up any right her husband might have had to object to the search of the house. When the officers arrived at the house they immediately arrested defendant and advised him of his *Miranda* rights, including the right to remain silent. Much of defendant's testimony, which largely contradicted that of Detectives Roe and Mattoon, was not credible. Defendant did not expressly object to the search. The officers were not relying on defendant's consent or acquiescence to the search, since they believed his consent was not required.

The trial court concluded "that silence by a person who has been advised of a Fifth Amendment right to remain silent cannot constitute a waiver of the Fourth Amendment right to object to a warrantless search of one's home."

The state argues that the search should be upheld on any one of four bases: (1) by occupying his house with another, defendant had assumed the risk that his co-occupant might permit the common areas of the house to be searched and, therefore, had no legitimate expectation of privacy with respect to those common areas; (2) the search, authorized by Kathleen Frame's consent, was valid regardless of any objection by defendant, since police satisfied knock-and-announce requirements; (3) Mrs. Frame's consent was valid against defendant in the absence of an express objection by defendant; or (4) when defendant failed to object to the search after being informed of his co-occupant's consent, his silence constituted consent.[3]

---

[3] Defendant does not challenge his wife's common control over the premises, her capacity to consent, or that she gave voluntary consent for the search.

We begin with the fundamental proposition that under the Fourth and Fourteenth Amendments to the United States Constitution and Oregon Constitution, Art I, § 9,[4] a search conducted without a warrant is "*per se* unreasonable * * * subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 US 347, 357, 88 S Ct 507, 19 L Ed 2d 576 (1967). *E.g., State v. Douglas*, 260 Or 60, 488 P2d 1366 (1971); *State v. Roy*, 28 Or App 861, 562 P2d 213 (1977). One of these specifically established exceptions to the warrant requirement is a search conducted pursuant to consent. *See, e.g., Schneckloth v. Bustamonte*, 412 US 218, 93 S Ct 2041, 36 L Ed 2d 854 (1973); *State v. Douglas, supra.*

We first address the state's contention that defendant, by jointly occupying a house with his wife, assumed the risk that she might consent to a search of the common areas and, therefore, had no legitimate expectation of privacy with respect to those areas. The starting point for our analysis of third party consent searches is *United States v. Matlock*, 415 US 164, 94 S Ct 988, 39 L Ed 2d 242 (1974). In *Matlock*, the court examined its prior third party consent cases, searching for a consistent theoretical underpinning. It noted that following *Amos v. United States*, 255 US 313, 41 S Ct 266, 65 L Ed 654 (1921), where the court left open the question whether a wife's consent to search premises co-occupied with her husband could waive the husband's Fourth Amendment rights, later court decisions demonstrated "that the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." 415 US at 170, 39 L Ed 2d at 249. For instance, in *Frazier v. Cupp*, 394 US 731, 89 S Ct 1420, 22 L Ed 2d 684 (1969), where defendant's

---

[4] The Oregon Supreme Court has refused to interpret Oregon Constitution, Art I, § 9, more strictly than the United States Supreme Court has interpreted the Fourth Amendment to the United States Constitution. *See, e.g., State v. Greene*, 285 Or 337, 591 P2d 1374 (1979); *State v. Flores*, 280 Or 273, 570 P2d 965 (1977).

cousin consented to a search of a duffel bag jointly used by both men and left with the cousin at the cousin's house, the court upheld the search, stating the defendant had "assumed the risk" that the cousin would allow someone to look inside. The court in *Matlock* further stated the rule:

"[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." 415 US at 171, 39 L Ed 2d at 249-50.

In an explanatory footnote, the court stated:

"Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see Chapman v. United States, 365 US 610, 5 L Ed 2d 828, 81 S Ct 776 (1961) (landlord could not validly consent to the search of a house he had rented to another), Stoner v. California, 376 US 483, 11 L Ed 2d 856, 84 S Ct 889 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." 415 US at 171 n. 7, 39 L Ed 2d at 250 n. 7.

A similar question was before us in *State v. Gordon*, 23 Or App 587, 543 P2d 321 (1975), *rev den* (1976), where the defendant and a female companion had been living together for more than eight months and were jointly occupying a hotel room. Police came to the room investigating a service station theft in which defendant was believed to be involved and found the woman in the room. Defendant was absent. The

[729]

woman gave her consent both orally and in writing to the officer's searching the room. The search revealed several blank checks linking defendant with the service station theft. These were discovered in a suitcase in a closet. The trial court found that they both exercised "common dominion" over the room and its contents.

We held that the evidence upheld the trial court's finding that both occupants shared "common dominion" over the hotel room they shared and therefore her consent to the search was effective and the evidence found in the suitcase was properly admitted.

In *State v. Middaugh*, 12 Or App 589, 507 P2d 42, *rev den* (1973), the court upheld a search of a medical kit in the kitchen pantry of defendant's house, based on the wife's consent. Prior to the wife's consent, the defendant had been arrested and taken to another room in the house. The court stated:

"The majority rule is that a wife (with joint and equal rights to possession and control) may consent to a search of the family premises, and this consent circumvents the Fourth Amendment right of the husband * * *. " 12 Or App at 593. (Citation omitted.)

Noting that the critical issue was "whether the defendant had a reasonable expectation of privacy as to the areas searched," 12 Or App at 594, the court ruled that any expectation of privacy defendant might have had as to the medical kit was not objectively reasonable.

In the case at bar the off-premises consent of defendant's wife and coinhabitant of the house was an effective consent. This is certainly the rationale of *United States v. Matlock*, 415 US 164, 94 S Ct 988, 39 L Ed 2d 242 (1974); *Frazier v. Cupp*, 394 US 731, 89 S Ct 1420, 22 L Ed 2d 684 (1969); *People v. Wood*, 31 NY2d 975, 341 NYS2d 310, 293 NE2d 559 (1973); and *State v. Gordon, supra.*

A recent decision involving this issue is *People v. Cosme*, 26 Crim Law Rptr 2265 (NY App December 26,

1979). *Cosme* involved a couple who were living together. Apparently a quarrel developed between the pair. The woman notified police that her male companion (the defendant) had narcotics and a gun concealed in their apartment. She gave the police explicit directions and assistance in finding where in the apartment the contraband was located.

The court held that a person who shares living space with others can authorize police to search the residence, even over the objections of the other inhabitants. Citing *United States v. Matlock, supra,* the court said that an individual who has unrestricted access to and control over shared premises is "vested in his own right" with the power to consent to a search. As for the other inhabitants, they have either assumed that risk or given up their expectations of privacy. In any event, the court said, they have "no right to prevent" a search to which an occupant with equal authority over the premises has knowingly and voluntarily consented. We agree with this rationale.

In *Coolidge v. New Hampshire,* 403 US 443, 91 S Ct 2022, 29 L Ed 2d 564 (1971), the court held, inter alia, that if a murder suspect's wife, wholly on her own initiative, seeks out her husband's guns and clothing and then takes them to the police station to be used as evidence against him, there is not an unconstitutional search and seizure, and the articles are admissible in evidence.

As the court observed in *Coolidge:*

"* * * It is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals."

Reversed and remanded for trial.