[No. 55655-5.   En Banc.   November 30, 1989.]

THE STATE OF WASHINGTON, *Petitioner*, v. DUNCAN FARWELL LEACH, *Respondent*.

Norm Maleng, Prosecuting Attorney, Cynthia S.C. Gannett, Senior Appellate Attorney, and Michael T.J. Hogan, Deputy, for petitioner.

Donald B. Kronenberg, for respondent.

PEARSON, J.*—Following presentation of the State's evidence by stipulation, and the defense testimony of Duncan Leach, defendant was convicted in King County Superior Court of three counts of second degree burglary and one count of second degree attempted theft. Defendant appealed his convictions, contending they were based upon evidence that had been seized in violation of the fourth amendment to the United States Constitution and article 1, section 7 of the Washington State Constitution. The Court of Appeals remanded to the trial court with instructions to conduct an additional hearing regarding the facts surrounding the allegedly violative search. State v. Leach, 52 Wn. App. 490, 761 P.2d 83 (1988). The State sought review.

At issue is the validity of a warrantless search where consent is obtained from a third party who possesses some control over the premises, but the defendant, who has superior control, is present at the time the search is conducted. We hold the police must obtain the consent of a cohabitant who is present and able to object in order to effect a valid warrantless search.

---

*Judge Vernon R. Pearson is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amend. 38).

## FACTS

In June 1986, Duncan Leach opened a travel agency named "Why Not Travel" in an office complex in Renton, Washington. Between July 9 and July 11, 1986, the C.J. Nagel Insurance Agency, a business in the same office complex as defendant's travel agency, was burglarized. Stolen were a notary stamp, other rubber stamps, and a box of copier paper. Between July 10 and July 12, 1986, the SPA Fitness, another business in the same office complex, was burglarized and a 3M brand copying machine was stolen. Finally, between July 11 and July 14, 1986, American Hot Airlines, also in the same complex, was burglarized and $150 in cash was stolen. On July 15, 1986, Duncan Leach contacted his insurance agent and the King County Police to report his travel agency had been burglarized and that an inteletype machine, as well as cash, had been stolen.

On July 24, 1986, Cynthia Armstrong, Duncan Leach's girl friend, who also went by the name Cynthia Leach, telephoned Detective Tucker of the King County Police to request a meeting with him. They subsequently met in front of the Renton Police Department and, at that time, Ms. Armstrong displayed a notary stamp and two rubber signature stamps bearing the name C.J. Nagel Insurance Agency. Additionally, Ms. Armstrong showed Detective Tucker a picture of Duncan Leach.

The following day, after executing a consent to search form for the travel agency office, Ms. Armstrong escorted Detective Tucker to the office and unlocked the business door with a key Duncan Leach had provided her. Mr. Leach was present at the business when they arrived. Detective Tucker placed Mr. Leach under arrest, handcuffed him, and placed him in an office chair. Detective Tucker then searched the office. During the search, Detective Tucker discovered a 3M brand copying machine that matched the description of the machine stolen from the health spa, some checks from the C.J. Nagel Insurance Agency, and the inteletype machine Mr. Leach had previously reported stolen. It should be noted, there is no evidence Detective

Tucker sought Mr. Leach's consent to search the office, nor is it established whether Mr. Leach objected to the search.

Upon Mr. Leach's pretrial motion to suppress the fruits of the police search of his office, the trial court conducted an evidentiary hearing. At that hearing, Ms. Armstrong testified she had considered Duncan Leach her common law husband, and she had used the name "Leach" on numerous legal documents. Ms. Armstrong further testified: (1) Mr. Leach had given her a key to the office; (2) she had done minor tasks in the office approximately eight times during the 2 months the business had been open; (3) her name appeared on the lease of the premises, although someone else had actually signed her name on the lease; and (4) her name also appeared on business cards directly below Duncan Leach's name and the term "Owners".

The Court of Appeals held a third party's consent to a search is invalid where the defendant is present at the time of the search, has a superior privacy interest in the premises, and objects to the search. *State v. Leach,* 52 Wn. App. at 496. Accordingly, the court remanded for additional findings.

## ANALYSIS

■ We begin with the assumption warrantless searches, and seizures incident thereto, are per se unreasonable, thus violative of constitutional protections. *State v. Houser,* 95 Wn.2d 143, 149, 622 P.2d 1218 (1980). As a result, the burden rests firmly upon the State to rebut the presumption by establishing the existence of one of the "carefully delineated" exceptions to the warrant requirement. *Arkansas v. Sanders,* 442 U.S. 753, 760, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979). *See also State v. Mathe,* 102 Wn.2d 537, 540–41, 688 P.2d 859 (1984).

Properly established, consent is one such exception. *State v. Vidor,* 75 Wn.2d 607, 452 P.2d 961 (1969). "Consent to a search establishes the validity of that search if the person giving consent has the authority to so consent." *State v. Mathe,* 102 Wn.2d at 541.

In *United States v. Matlock,* 415 U.S. 164, 170, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974), the Court held "the consent of one who possesses common authority over premises or effects is valid as against the *absent,* nonconsenting person with whom that authority is shared." (Italics ours.) In a footnote, the Court explained the term "common authority":

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third–party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co–inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

(Citations omitted.) *United States v. Matlock,* 415 U.S. at 171 n.7. This court has expressly adopted the *Matlock* standard for determining issues of consent under Const. art. 1, § 7. *State v. Mathe,* 102 Wn.2d at 543. Thus, it serves as the guidepost for our analysis under both constitutions.

As this court has recognized, the justification for the "common authority" rule enunciated in *Matlock* is based upon the theories of "reasonable expectation of privacy" and "assumption of risk". *State v. Christian,* 95 Wn.2d 655, 659–60, 628 P.2d 806 (1981). In essence, an individual sharing authority over an otherwise private enclave inherently has a lessened expectation that his affairs will remain only within his purview, as the other cohabitants may permit entry in their own right. As a result, the law recognizes the individual has assumed the risk a cohabitant may permit a search of a commonly shared area, in the individual's absence.

The common authority rule, then, requires a 2–prong analysis: "First, a consenting party must be able to permit the search in his own right. Second, it must be reasonable to find that the defendant has assumed the risk that a co–

occupant might permit a search." *State v. Mathe*, 102 Wn.2d at 543–44. As the Court of Appeals in the instant case properly recognized, Ms. Armstrong's authority over the premises would have validated a warrantless search in Mr. Leach's absence.

However, since the rule enunciated in *Matlock* only refers to "absent, nonconsenting" persons, we must determine whether the rationale upon which *Matlock* rests is equally applicable where the defendant is present at the time of the search. Arguably, one's ability to control the premises is not subordinated to a joint occupant *when one remains on the premises and is able to object to access by others.*

Neither commentators nor case law is in accord as to the appropriate rule in such an instance:

> On the one hand, the theory that *Matlock* is intended to leave the joint occupant with "freedom to act in his own or the public interest" is said to extend even to the point where that freedom must prevail when the defendant is "present and objecting." The contrary position is that the consent of both is required when both are present because "ordinarily, persons with equal 'rights' in a place would accommodate each other by not admitting persons over another's objection while he was present."

(Footnotes omitted.) 3 W. LaFave, *Search and Seizure* § 8.3(d), at 251–52 (2d ed. 1987). Therein, LaFave noted, "[t]hough there is merit to both positions, the latter has somewhat greater appeal." 3 W. LaFave, at 252. We are similarly persuaded.

In *Lucero v. Donovan*, 354 F.2d 16 (9th Cir. 1965), an action brought against police officers for unlawful arrest and search, the police obtained the brother's consent to search his sister's apartment, where the brother was arguably only an invitee. When the police and her brother entered, the sister demanded the production of a search warrant. After arresting and handcuffing the sister, the police proceeded to search the apartment, having produced no warrant. Ultimately, no incriminating evidence was discovered. In reversing the judgment following a directed

verdict in favor of the police officers, the court held the brother's consent, in light of the sister's presence, was invalid to confer authority for a warrantless search:

> Assuming that Frank gave his own consent for search of the apartment, his authority, if any, to act for his sister was rescinded by her expressed protest and her demand for a search warrant.

*Lucero v. Donovan,* 354 F.2d at 21.

Similarly, in *Lawton v. State,* 320 So. 2d 463 (Fla. Dist. Ct. App. 1975), the estranged wife of the defendant obtained entrance to the defendant's apartment after borrowing the passkey from the apartment manager. Upon entering the bedroom to the apartment, the wife discovered the defendant with another woman and observed marijuana and drug paraphernalia. The wife promptly went next door and telephoned the police. When the police arrived, the wife opened the apartment door and told the officers to enter. Inside, the husband confronted the officers and told them to leave. Resolving the clash between consent and objection, the court held:

> Assuming, without deciding, that Mrs. Lawton still had sufficient control over the premises as to authorize her to consent to a search, we believe that the search cannot stand because *appellant was physically present on the premises* and *affirmatively objected to the search.*

*Lawton v. State,* 320 So. 2d at 464. Two years later, that rule was well explained:

> [T]he person whose property is the object of a search should have controlling authority to refuse consent. . . . Though a joint occupant should have authority to consent to a search of jointly held premises if the other party is unavailable, a present, objecting party should not have his constitutional rights ignored because of a leasehold or other property interest shared with another. This is particularly true where the police are aware that the person objecting is the one whose constitutional rights are at stake.

(Citation omitted.) *Silva v. State,* 344 So. 2d 559, 562–63 (Fla. 1977). *See also Tompkins v. Superior Court,* 59 Cal. 2d 65, 378 P.2d 113, 27 Cal. Rptr. 889 (1963).

As one commentator has noted, the point at which the difficult choice between consent and objection must be

made is only where the occupants have equal use and control of the premises and where both are present:

> When two or more persons have equal use of a place in which both are present, the consent of one does not normally eliminate the need for the consent of the other(s) before a search is made; ordinarily, persons with equal "rights" in a place would accommodate each other by not admitting persons over another's objection while he was present.

Weinreb, *Generalities of the Fourth Amendment,* 42 U. Chi. L. Rev. 47, 63 (1974–1975).

Nonetheless, other jurisdictions have adopted the contrary rule. In *People v. Cosme,* 48 N.Y.2d 286, 397 N.E.2d 1319, 422 N.Y.S.2d 652 (1979), an unmarried couple occasionally shared an apartment. Following a domestic quarrel, the woman telephoned the police, waited in the outer vestibule of the apartment until the police arrived, informed the officers there was an illegally possessed gun and cocaine in the apartment, and then escorted the police into the apartment. They were met by the defendant, whom the officers handcuffed under protest and made lie face down on the floor. In affirming the conviction, the court reasoned

> an individual who possesses the requisite degree of control over specific premises is vested in his own right with the authority to permit an official inspection of such premises . . . [T]he fact remains that where an individual shares with others common authority over premises or property, he has no right to prevent a search in the face of the knowing and voluntary consent of a co–occupant with equal authority.

*People v. Cosme,* 48 N.Y.2d at 292.

Citing the rationale in *People v. Cosme, supra,* the court in *State v. Frame,* 45 Or. App. 723, 609 P.2d 830 (1980), *cert. denied,* 450 U.S. 968 (1981), similarly affirmed the conviction of a husband, where the wife had given the key to their home and her consent to search to the police. Upon entering the home, the officers confronted the husband, handcuffed him, and informed him they had his wife's consent to search.

In order to find third party consent reasonable in these cases, the Oregon and New York courts were constrained to

ignore the distinction between the facts at issue and those in *Matlock*. While it is reasonable for the law to presume an individual has assumed the risk a cohabitant will permit others to enter during his absence, where that individual is present, he has not assumed that a cohabitant will permit entrance over his objection.

The only Washington case that has brushed this issue is *State v. Chichester,* 48 Wn. App. 257, 738 P.2d 329 (1987). Therein, an absent wife consented to a police search of the home. Although the defendant husband was present, he was not afforded an opportunity to object. Accordingly, the trial court suppressed the evidence. The Court of Appeals, however, held the wife's consent was valid under the common authority rule. With limited analysis of the issue we discuss today, the court devoted most of its energy to a discussion of the reasonableness of the entry, absent compliance with the "knock and wait" statute.

Reaching a result contrary to *Chichester,* the Court of Appeals in the instant case relied heavily upon *United States v. Impink,* 728 F.2d 1228 (9th Cir. 1984), the most recent case to discuss this issue. In *Impink,* the lessor of a home had been given limited authority by the lessee to store an item in the garage adjacent to the home. Upon sighting laboratory equipment in the garage, the landlord notified police and assisted them in gaining entry into the home. During their investigation, the police knew the lessee was present, yet failed to obtain his consent. The court reversed the defendant's conviction:

> We do not hold that police must invariably seek consent from the suspect before relying on a third party's consent. However, when the police intentionally bypass a suspect who is present and known by them to possess a superior privacy interest, the validity of third party consent is less certain.
>
> . . . .
>
> . . . [W]e . . . conclude that effective consent was precluded by the combined elements of this case. Where a suspect is present and objecting to a search, implied consent by a third party with an inferior privacy interest is ineffective.

(Citations omitted.) *United States v. Impink,* 728 F.2d at 1234. We are persuaded by much of the Ninth Circuit's analysis.

■ Where the police have obtained consent to search from an individual possessing, at best, equal control over the premises, that consent remains valid against a cohabitant, who also possesses equal control, only while the cohabitant is absent. However, should the cohabitant be present and able to object, the police must also obtain the cohabitant's consent. Any other rule exhalts expediency over an individual's Fourth Amendment guaranties. Accordingly, we refuse to beat a path to the door of exceptions.

Where, as here, the police obtain information establishing probable cause to effect a lawful search, ideally they would obtain a warrant. We wholeheartedly concur with the sentiment expressed in *United States v. Impink, supra* at 1231: "Where the police have ample opportunity to obtain a warrant, we do not look kindly on their failure to do so." Where the police are content to rely upon the consent of a third party to validate a warrantless search, there is an improvident risk of an illegal search and seizure. In point of fact, there should have been no confusion in the case at hand. From the State's perspective, Ms. Armstrong, at best, had only equal control over the office. Thus, when confronted with Mr. Leach's presence, not having obtained a warrant, the officer should have requested Mr. Leach's consent, as well.

Accordingly, we remand for the purpose of an evidentiary hearing where the burden will be upon the State to establish it obtained consent from Mr. Leach.

UTTER, BRACHTENBACH, DOLLIVER, and SMITH, JJ., concur.

DORE, J. (dissenting)—Officer Tucker entered a 2-office suite located in a small shopping center on the invitation of Armstrong, the defendant's live-in girl friend and business partner. On entering the outer office, Tucker saw the

defendant. At that juncture the officer had probable cause to believe the defendant had committed at least three felonies. He immediately arrested him. Having made a lawful arrest, the officer made a search incident to the arrest.

Defendant does not claim his arrest was illegal nor did he make any objection to the search of his inner office. The majority reasons that the officer had a duty to inquire whether defendant consented to the search. In view of the fact that the articles were seized in defendant's office pursuant to a search triggered by a lawful arrest, we need inquire no further.[1] I would affirm all counts.

## FACTS

Leach was amorously involved with Cindy Armstrong, who called herself Cindy Leach. They considered themselves common law husband and wife.

The couple moved from several states to avoid numerous warrants issued for Leach's arrest for indecent exposure charges. Defendant also had prior convictions for forgery and burglary. In May 1986, defendant fled from criminal charges in Vermont and came to Seattle to start a travel agency. Armstrong followed. Apart from a brief period when Armstrong fled to a battered woman's shelter, they lived together.

In June 1986, defendant leased commercial space, for his business, in an office complex in Renton, Washington. Armstrong had her own key to the office. She performed clerical work and maintained a desk in the suite. The travel agency's business cards identified the owners of the agency as "Duncan and Cynthia Leach," a name which Armstrong sometimes used, considering herself Leach's common law wife.

---

[1]The State defended the denial of suppression by asserting the "consent exception" to the requirement of a search warrant and did not argue that the search of the office could be justified as incident to the arrest. Nevertheless, this court may affirm if the trial court's judgment is sustainable on any theory. *LaMon v. Butler*, 110 Wn.2d 216, 223, 751 P.2d 842 (1988), *aff'd*, 112 Wn.2d 193, 770 P.2d 1027 (1989).

After Leach moved into the building, three of his commercial neighbors were burglarized, the C.J. Nagel Insurance Agency, SPA Fitness, Inc. and The American Hot Airlines, between July 9, 1986 and July 11, 1986. The three businesses were entered without permission and various items and cash were taken. Specifically, a notary stamp, rubber stamps and a box of copier paper were taken from Nagel's agency. A 3M copying machine was taken from Fitness, Inc. One hundred fifty dollars in cash was taken from American Hot Airlines. All three offices apparently were entered with a key as there was no evidence of forced entry. On July 15, 1986, defendant made a report to the authorities claiming that his TTY machine and cash had been stolen. He also filed a claim with his insurance company for the claimed stolen property. A few days later, the TTY machine mysteriously reappeared in the defendant's office, but he did not advise his insurance company of its return.

On July 24, 1986, Armstrong called Detective Tucker of the King County Police Department. Armstrong advised that Leach was responsible for the office burglaries. Armstrong then met with Tucker and gave him a notary stamp and two rubber stamps bearing the name of C.J. Nagel. She claimed these items were taken from defendant's apartment and had been stolen from the C.J. Nagel Insurance Agency. She told Tucker there were other stolen items in the office. She advised that the defendant had confessed to her about burglarizing the three offices in the complex with a master key in his possession. The next day, Cindy signed the following statement setting forth in detail the defendant's admission of the three burglaries.

> My husband [defendant] and I moved from Vermont in April/May because he was going to jail for a "L & L" [Lewd and Lascivious] charge. We started a travel agency in Renton at 14410 S.E. Petrovitsky, #200. Over the last couple of weeks, he has entered neighboring businesses, taking money and various items. He used a master key. He brought home a notary seal and two rubber signature stamps that came from C. J. Nagel Insurance. . . . He also has been writing several checks on closed accounts. He has a copy machine in our office that he

said came from the Health Club as part of an agreement so he wouldn't sue them for making too much noise. To cover up these burglaries and to make some insurance money, he reported a theft at our office, too. He is claiming this through State Farm; Lance Leonard is the agent.

This statement is true and accurate to the best of my knowledge.

/s/ Cynthia L. Leach

Clerk's Papers, at 24.

On July 25, 1986, Armstrong signed a consent to search the travel agency office. Thereafter, Armstrong accompanied Tucker and another officer to the travel agency at approximately 1:00 p.m. The door was locked. Using Armstrong's key, Tucker and Armstrong entered the office, which consisted of two rooms, one behind the other. Sitting in plain view in the front office was the 3M copy machine which Tucker recognized as being similar to one reported stolen from SPA Fitness, Inc. Leach was on the floor in the rear room. Detective Tucker identified himself and advised defendant he was under arrest for burglary. Detective Tucker handcuffed defendant, placed him on the sofa and then searched the office. The defendant did not object to the search. Tucker located a box of copier paper in a cabinet and blank checks from C.J. Nagel Insurance Agency in defendant's desk. Tucker also found the TTY machine which Leach had reported stolen in the burglary of his own office. Tucker also seized a locked file box and Leach's personal briefcase, but these items were not opened. Following Leach's arrest, a master key to the office complex was found among his personal effects. The manager of the complex stated that Leach was not authorized to have a master key.

The defendant was charged with three counts of burglary in the second degree and one count of attempted theft in the second degree. At trial, defendant agreed to proceed on the basis of stipulated police reports, plus his own testimony. The trial court found the defendant's testimony unbelievable and found him guilty as charged on all four counts.

SEARCH INCIDENT TO A LAWFUL ARREST

It is well settled that a search and seizure without a warrant is constitutionally valid under the fourth amendment to the United States Constitution and article 1, section 7 of the Washington State Constitution, if incidental to a lawful arrest. *State v. Patterson,* 112 Wn.2d 731, 735, 774 P.2d 10 (1989). Recently in *State v. Stroud,* 106 Wn.2d 144, 152, 720 P.2d 436 (1986), we held that potential danger to officers and destructibility of evidence outweigh privacy interests protected by the Fourth Amendment and Const. art. 1, § 7, and warrant a bright–line rule permitting limited searches even without exigent circumstances.

In *Stroud,* the defendants were lawfully arrested outside their vehicle. After the defendants were handcuffed and placed in the patrol car, the officers searched the entire passenger compartment, including the unlocked glove compartment and an unzipped luggage bag. The defendants moved to suppress the seized evidence, as it was seized in a warrantless search at a time when the officers were not in danger and there was no chance that the evidence would be destroyed. We rejected this argument stating at page 152:

> To weigh the actual exigent circumstances against the actual privacy interests on a case–by–case basis would create too difficult a rule to allow for both effective police enforcement and also protection of individual rights. However, a reasonable balance can be struck. During the arrest process, including the time immediately subsequent to the suspect's being arrested, handcuffed, and placed in a patrol car, officers should be allowed to search the passenger compartment of a vehicle for weapons or destructible evidence. However, if the officers encounter a locked container or locked glove compartment, they may not unlock and search either container without obtaining a warrant.

Here the police had probable cause to effect a lawful arrest, with Armstrong's statement and the stolen items turned over to police prior to entry into the agency office. They had every reason to believe that defendant had committed at least three felonies. Probable cause is based upon the totality of facts and circumstances known to the arresting officer. *State v. Scott,* 93 Wn.2d 7, 10–11, 604 P.2d 943,

*cert. denied,* 446 U.S. 920 (1980). Finally, they knew that two outstanding warrants, one from Vermont and one from Wyoming, existed for the defendant.

The police, upon entering the agency, lawfully arrested Leach for the burglaries. During the time immediately subsequent to Leach being arrested and handcuffed, the police were allowed to make a search incident to the arrest. No consent was needed from Leach.

### CONSENT

The majority holds "the police must obtain the consent of a cohabitant who is present and able to object in order to effect a valid warrantless search." Majority, at 736. First the search was made pursuant to a lawful arrest. There is no contention that Leach's arrest wasn't lawful. For argument sake, however, let's assume it was illegal. The rule espoused in the cases relied on by the majority is not triggered until the defendant objects to the search. Only when the defendant objects does the third party's consent become invalid. *See United States v. Impink,* 728 F.2d 1228 (9th Cir. 1984) ("Where a suspect is present and *objecting* to a search, implied consent by a third party with an inferior privacy interest is ineffective.") (Italics mine.) *Impink,* at 1234.

Important to a resolution of this consent issue is an understanding of what *Impink* and other cases relied upon by the majority did not address. None of these cases addressed the situation where the defendant was present and not objecting. Instead, they all deal with situations where the defendant was present and *objecting.* Here the defendant did not object. Nonetheless the majority relies on these cases to invariably hold that the police must obtain defendant's consent. The majority gives no rationale or reasoning for imposing this new burden upon the police, nor from departing from the cases it relies upon.

Further, in Washington, we have upheld consensual searches where the consenting occupant had joint control of

the premises searched, and voluntarily allowed police officers into the premises. *See, e.g., State v. Vaster,* 24 Wn. App. 405, 408–09, 601 P.2d 1292 (1979) (defendant present and objecting); *State v. Porter,* 5 Wn. App. 460, 463, 488 P.2d 773 (1971) (defendant on premises); *State v. Jeffries,* 105 Wn.2d 398, 414, 717 P.2d 722, *cert. denied,* 479 U.S. 922 (1986); *State v. Gillespie,* 18 Wn. App. 313, 316, 569 P.2d 1174 (1977), *review denied,* 89 Wn.2d 1019 (1978); *State v. Breckenridge,* 4 Wn. App. 328, 330, 481 P.2d 26 (1971) (search consented to by occupier of house upheld). *See generally* 3 W. LaFave, *Search and Seizure* § 8.4(a) (2d ed. 1987). Our courts have previously held that when two persons have equal right to the use or occupancy of the premises, either one can authorize a search; the evidence produced in a search authorized by one may be used to support a charge against the other. *State v. Bellows,* 72 Wn.2d 264, 268, 432 P.2d 654 (1967).

Here we are required to consider the evidence in a light most favorable to the State. The police officer's entry was expressly consented to by the joint tenant and partner. The defendant did not object to the search. It is not incumbent upon the police to seek defendant's consent to make a search after he already had been lawfully arrested.

Search warrant requirements exist in order to protect a person's privacy. The majority's cases on privacy all involve occupants' homes or apartments. In *Lawton v. State,* 320 So. 2d 463 (Fla. Dist. Ct. App. 1975), it was defendant's apartment that the police searched over defendant's objections. Again in *United States v. Impink,* 728 F.2d 1228 (9th Cir. 1984), the police searched the defendant's house.

Here the search occurred in a commercial office, not in a private home or apartment. There can be no comparable right of privacy in a commercial establishment where landlords and cleaning personnel have master keys. In these situations, an individual's expectation of privacy is not justified. Consequently, a commercial tenant does not have the same expectation of privacy regarding his business as he does with respect to his home. This diminished expectation

of privacy in commercial offices should not be allowed to vitiate the consent of one who has common authority over the business premises.

## HARMLESS ERROR

The "validity" of the search is a nonissue as there was substantial evidence, independent of the property seized in the search, to sustain the defendant's convictions for the four crimes.

An error of constitutional magnitude is prejudicial unless this court can say beyond a reasonable doubt that the error did not contribute to the guilty verdict or that the untainted evidence is so overwhelming it necessarily leads to guilt. *State v. Acosta,* 101 Wn.2d 612, 683 P.2d 1069 (1984). The following items were seized in the search: TTY machine, a box of copier paper, a stack of insurance checks, a copy of the lease, miscellaneous paperwork and keys. In addition, Tucker seized a locked file box and closed personal briefcase which were not searched. Clerk's Papers, at 27. Even if these items are suppressed there is substantial independent evidence to sustain Leach's convictions on all four counts.

### Count 1
### The Burglary of C.J. Nagel Insurance

The C.J. Nagel Insurance Agency reported that someone entered its office without force, although it was locked, and removed the notary stamp, several rubber stamps and a box of copy machine paper. Prior to the search, Cindy Armstrong delivered to the police a notary stamp and rubber stamps bearing the name of C.J. Nagel Insurance Agency. Armstrong, in a sworn statement, said that these items came from defendant's apartment and, furthermore, that the defendant admitted having a copy of the master key which he used to enter the other offices in his complex. When defendant was searched, the key was found in his personal effects. This evidence is substantial and supports the trial judge's conviction on count 1.

## Count 2
## SPA Fitness

With respect to count 2, which concerns the stolen 3M brand copying machine taken from the office of SPA Fitness, Inc., the copy machine was in plain view of the arresting officers, as soon as they walked into the office at the invitation of Armstrong, *before* the search was commenced. A defendant's spouse having equal right to occupation of the premises may consent to entry of the premises. *State v. Hartnell,* 15 Wn. App. 410, 417, 550 P.2d 63, *review denied,* 87 Wn.2d 1010 (1976). Recovering the stolen 3M copying machine in defendant's office supports the defendant's conviction on count 2.

## Count 3
## American Hot Airlines

American Hot Airlines reported that someone entered its locked office without permission and removed $150. There was no cash seized in the search of defendant's office. Because there was no evidence from American Hot Airlines seized during the search, the articles seized could not have affected the guilty verdict on this count.

## Count 4
## False Insurance Claim

With respect to count 4, defendant was charged with second degree theft for filing a false insurance claim for the TTY machine. Armstrong, before the search, told officers the defendant had told her that he had falsely reported to the police and to his insurance agent that the travel agency office had been burglarized. An investigation revealed the defendant had reported the burglary to the police and filed a claim with his insurance agent for the TTY machine. Defendant testified at trial that he filed an insurance claim for his missing TTY machine, but failed to withdraw the claim when the TTY machine mysteriously reappeared the following week. Defendant's admission to Armstrong and

testimony corroborated the police investigation. Defendant's own testimony is enough to sustain his conviction on count 4.

## CONCLUSION

When Detective Tucker entered the subject office at the invitation of Armstrong's live-in girl friend and business partner, he looked in the inner office and immediately identified the defendant. At that juncture, he had substantial evidence in his possession to establish probable cause that defendant had committed a number of felonies. He then arrested Leach and made a search incident to the arrest. Defendant made no objection to the search and the defendant here makes no contention that the arrest was illegal or that the officer couldn't make a search incident to the lawful arrest. Even if the items seized were suppressed, there is sufficient other evidence obtained prior to the search to sustain the convictions. Finally, the majority's cases on privacy all involve occupants' homes or apartments. There can be no comparable right of privacy in a commercial establishment where landlords and cleaning personnel have access to the premises.

I would affirm on all counts.

CALLOW, C.J., and ANDERSEN and DURHAM, JJ., concur with DORE, J.