IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31862-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES BRUCE HAMBLETON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — James Hambleton appeals his convictions for theft of a motor vehicle and burglary in the second degree. He challenges the trial court's denial of his motion to suppress pictures found on his cell phone, which was relinquished to police officers by his girlfriend. He also argues the evidence was insufficient to support the guilty verdicts.

Substantial evidence supports both the trial court's finding that Mr. Hambleton's girlfriend had common authority over the cell phone she relinquished to police and the jury's verdicts. For these reasons, and because Mr. Hambleton raises no viable issue in a pro se statement of additional grounds, we affirm.

FACTS AND PROCEDURAL BACKGROUND

RJ Mac is a business that performs contract services for the Burlington Northern Santa Fe Railroad (BNSF). The services include cleaning cars, shifting and loading cars, and delivering supplies. It is located in Pasco, on North Railroad Avenue. James Hambleton was formerly an RJ Mac employee.

Sometime between 11:00 and 11:35 p.m. one Friday night in January 2013, an employee at a neighboring business heard and then saw a truck leaving the area and realized that an RJ Mac service truck was missing from the businesses' shared parking lot. The employee called his manager, who called the owner of RJ Mac at home, alerting him to the missing truck. RJ Mac's owner, Denver McFarland, traveled to his business and confirmed the service truck was not there. The truck's keys were missing from the locker in his office, where they were kept. Only Mr. McFarland and four of his employees—one being Mr. Hambleton—knew where the keys were kept, and employees were not authorized to enter the business at night. Mr. McFarland called the police to report a burglary and the missing truck.

Mr. McFarland then noticed Mr. Hambleton's van, which he later described as "hid[den] behind the building." Verbatim Report of Proceedings (RP) (Trial and Sentencing)[1] at 61. Employees usually parked in the main parking lot. While other

---

[1] The verbatim report of proceedings consists of multiple volumes. We refer to the volume containing the transcript of proceedings taking place on June 26, 27, and 28,

vehicles nearby had frost on their windshields, Mr. Hambleton's van did not, suggesting it had not been there long. While awaiting police, Mr. McFarland called Mr. Hambleton and asked about the van's presence and the missing truck. Mr. Hambleton told his boss he parked where he did in order to hide the van from his live-in girlfriend, Jodie Huey. He denied any knowledge of the missing truck.

When Pasco police officers arrived at RJ Mac in response to the theft report, Mr. McFarland pointed out Mr. Hambleton's van. The officers' own attempt to phone Mr. Hambleton was unsuccessful. They were able to reach Ms. Huey, but did not learn from her where to find Mr. Hambleton.

After completing their investigation at RJ Mac at around 3:00 a.m., the responding officers were returning to the Pasco Police Department when they saw a man who turned out to be Mr. Hambleton walking toward RJ Mac on a desolate stretch of road. The officers stopped him. Asked what he was doing in the area, he said he and his girlfriend, Jodie Huey, had an argument and that she had stopped and evidently invited him out of her car. According to the officers, Mr. Hambleton changed his story when he learned they had already spoken with Ms. Huey, telling them it was his "*other* girlfriend, Leslie,"

---

July 1 and 2, and August 13, 2013, as the "Trial and Sentencing" report of proceedings; to the volume containing the transcript of proceedings taking place on February 5, March 5 and 19, April 16, and June 4, 2013, as the "Pretrial Hearings" report of proceedings; and to the volume containing the transcript of proceedings taking place on June 26 and 27, 2013, as the "Voir Dire" report of proceedings.

who left him on the roadside. RP (Trial and Sentencing) at 171 (emphasis added). The officers were satisfied they had probable cause and arrested Mr. Hambleton.

The following Monday, Mr. McFarland noticed that six generators belonging to BNSF that had been stored in RJ Mac's warehouse were missing. A portion of the pallet on which they had been sitting was found on RJ Mac's forklift, which had been moved from where it was parked the prior Friday. Mr. McFarland surmised the forklift was used to lift BNSF's generators into the back of the service truck.

The missing service truck was found the same day, parked across town in front of a house. Keys to RJ Mac's warehouse, which were typically kept inside the office, were found in the bed of the truck. There were no signs of forced entry into the truck and the ignition was not damaged, suggesting that keys had been used to enter and start it. A witness told officers she saw a man walk away from the parked truck at around 8:30 a.m. on the Saturday after the theft—timing that would have been several hours after Mr. Hambleton was arrested.

Investigation of the theft and burglary was assigned to Detective Brad Gregory, who contacted Leslie Osborne—the "Leslie" Mr. Hambleton claimed left him on the roadside on the night of the theft. Ms. Osborne denied being out with Mr. Hambleton the night of the theft. Producing her phone, Ms. Osborne showed the detective text messages she had sent to and received from with Mr. Hambleton that night, including one sent by Mr. Hambleton at 1:14 a.m. that she did not see until the following morning. It said,

"Please call me. Need your help." RP (Trial and Sentencing) at 255.

Detective Gregory also spoke with Ms. Huey. According to the detective, she was "as interested as we were as to what had happened." RP (Pretrial Hearings) at 74. Detective Gregory learned from Ms. Huey that at Mr. Hambleton's request, she had picked up his property from the jail following his arrest. She had the phone from which he had sent text messages to Ms. Osborne. Ms. Huey voluntarily surrendered the phone to the detective.

After obtaining the phone, Detective Gregory applied for a search warrant. Before his application was granted, he received a call from Ms. Huey, who asked him to provide two phone numbers from the phone's contact list. He retrieved the numbers from the phone and provided them to her.

The application for a search warrant was granted, and the cell phone turned out to contain photographs of generators similar to those stolen from RJ Mac. Mr. Hambleton moved to suppress evidence obtained from the cell phone, but the State argued Ms. Huey had common authority over the phone and had consented to the search. At the CrR 3.6 hearing, Detective Gregory testified to how he obtained the phone:

> I told Miss Huey that I wanted to do a search warrant on the phone to obtain the information from inside the phone. She said that she wanted to cooperate and give me the phone. She said that the phone was hers. She gave it to Mr. Hambleton. She made the contract. She bought the phone. And I decided at that point that that would be legal for her to give me the phone. She was concerned that Mr. Hambleton would be upset with her if she gave me the phone. Although I told her that I could go back to the

5

police department, get a warrant and come back and look for the phone, she immediately told me I didn't have to do that. She would give me the phone. She actually wanted me not to tell him that she was giving it to me of her own free will. She was afraid he'd be upset with her.

RP (Pretrial Hearings) at 75. In cross-examining the detective, Mr. Hambleton's lawyer unsuccessfully challenged his statement that Ms. Huey "bought the phone."[2] Mr. Hambleton did not testify at the suppression hearing.

The trial court denied the motion to suppress, concluding that "[u]nder the common authority rule, Ms. Huey had authority to release the cell phone to [Detective] Gregory and consent to its search." Clerk's Papers (CP) at 229. The generator photographs from the phone were admitted at trial, and the State argued to the jury that "[i]f you have pictures of generators on your cell phone you're interested in trafficking in generators, buying generators, [or] providing generators to someone who's . . . interested in buying some generators. . . . Nobody has pictures of generators on their cell phone [out of] love." RP (Trial and Sentencing) at 406.

Mr. Hambleton was found guilty as charged. He appeals.

---

[2] The following exchange took place:

Q. You testified earlier that you understood that this cell phone at issue was under contract by Miss Huey? Is that right?
A. She told me that, yes.
Q. Isn't it true that Mr. Hambleton actually purchased the phone, but the contract was in her name?
A. I would have no idea.

RP (Pretrial Hearings) at 85.

6

## ANALYSIS

### I. *Suppression Decision*

Mr. Hambleton assigns error to the trial court's finding, in ruling on the motion to suppress that "Ms. Huey had purchased [the cell phone]," and to its denial of the motion to suppress. Br. of Appellant at 1. In reviewing the denial of a suppression motion, we determine whether substantial evidence supports the challenged findings of fact and whether the findings support the conclusions of law. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009).

Under article I, section 7 of the Washington State Constitution, "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."[3] A warrantless search or seizure is per se unreasonable and without authority of law. *State v. Morse*, 156 Wn.2d 1, 7, 123 P.3d 832 (2005). One of the few carefully delineated exceptions to the warrant requirement is consent. *State v. Leach*, 113 Wn.2d 735, 738, 782 P.2d 1035 (1989). "The State must meet three requirements in order to show that a warrantless but consensual search was valid: (1) the consent must be voluntary; (2) the person granting consent must have authority to consent; and (3) the search must not

---

[3] When a party alleges violations of both the Fourth Amendment of the United States Constitution and article I, section 7 of the Washington State Constitution, we analyze the state constitution first because it is more protective of individual privacy. *State v. MacDicken*, 179 Wn.2d 936, 940, 319 P.3d 31 (2014) (citing *State v. Walker*, 157 Wn.2d 307, 313, 138 P.3d 113 (2006)).

7

exceed the scope of the consent." *State v. Walker*, 136 Wn.2d 678, 682, 965 P.2d 1079 (1998). At issue here is only the second requirement.

In search and seizure cases involving cohabitants, our Supreme Court has adopted the common authority rule. *Morse*, 156 Wn.2d at 7-8. The consent to a search by a cohabitant who has common authority over property is valid against the absent nonconsenting cohabitant. *Walker*, 136 Wn.2d at 683-84 (citing *Leach*, 113 Wn.2d at 744). Common authority rests not on "the law of property, with its attendant legal refinements, but . . . rather on mutual use of the property." *Morse*, 156 Wn.2d at 7. The reasoning behind the common authority rule is that a person's expectation of privacy is necessarily reduced when the authority to control a space or a possession is shared with another. *Id.* A person assumes the risk that the individual they share authority with may allow an outsider access to the property.

"The mere fact that a certain object may be characterized as a personal effect does not compel the conclusion that no risk is assumed by leaving that object in premises also occupied by a spouse. The joint dominion and control of a husband and wife over the family home may extend to a non-consenting spouse's personal effects." 12 WASHINGTON PRACTICE: CRIMINAL PRACTICE & PROCEDURE § 2713, at 623 (3d ed. 2004).

At the suppression hearing, Detective Gregory testified Ms. Huey told him she

8

bought the phone.[4]  When challenged on this point on cross-examination, the detective

admitted he "would have no idea" if Mr. Hambleton *actually* purchased the phone.  RP

(Pretrial Hearings) at 85.  But since no evidence was offered that Mr. Hambleton actually

purchased it, the only evidence before the court as to its purchase was Detective

Gregory's testimony that Ms. Huey "said that the phone was hers.  She gave it to Mr.

Hambleton.  She made the contract.  She bought the phone."  RP (Pretrial Hearings) at

75.  Substantial evidence supported the trial court's finding that "Ms. Huey had

purchased [the cell phone]."  CP at 229.

And the facts found by the court support its denial of the suppression motion.

They state, in their entirety:

> Ms. Huey and defendant lived together and have a child in common.  Ms.
> Huey had at least an equal right with defendant to possess the cell phone.
> While defendant used the phone, Ms. Huey had purchased it and the
> contract was under her name.  Under the common authority rule, Ms. Huey
> had authority to release the cell phone to [Detective] Gregory and consent
> to its search.  While such consent by itself was sufficient, [Detective]
> Gregory took the additional step of obtaining a search warrant for the cell
> phone.  The affidavit submitted in application for the warrant established
> probable cause and the warrant was proper in all respects.  Any omissions
> from the affidavit were not material to the probable cause determination.

*Id.*

Presented with evidence that Ms. Huey purchased the phone, that the contract was

---

[4] She testified otherwise at trial, stating Mr. Hambleton purchased the phone but
that the phone contract was under an account in her name only, and that she and Mr.
Hambleton split the bills.

under her name, that she lived with Mr. Hambleton, and that he used the phone, the court reasonably found common authority, and a risk assumed by Mr. Hambleton that Ms. Huey might allow an outsider access to the phone. The fact that he asked Ms. Huey to pick up the phone and his other property following his arrest lends further support. Even evidence that the phone was almost always used by Mr. Hambleton would not detract from this other evidence of common authority. *See State v. Gillespie*, 18 Wn. App. 313, 569 P.2d 1174 (1977) (wife could consent not only to a search of her and her husband's home, but also to a search of his jacket).[5]

The trial court did not err.

## *II. Sufficiency of Evidence*

Mr. Hambleton's specific challenges to the sufficiency of the evidence to support the guilty verdicts is that the State did not present evidence of an overt act, or that he had knowledge his actions would "promote or facilitate" the commission of theft of a motor vehicle or second degree burglary. In making these arguments, he concedes only that the State proved that "his van [was] parked at [RJ Mac] when the pickup was driven off." Br. of Appellant at 17. The State offered evidence from which a reasonable jury could find much more.

---

[5] Because we affirm the trial court's decision on the basis of common authority and consent, we need not address Mr. Hambleton's argument that the detective illegally searched the phone before obtaining the search warrant when he retrieved the two phone numbers requested by Ms. Huey. The detective had consent to retrieve the numbers.

10

"The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficient evidence admits the truth of the State's evidence as well as the truth of all inferences reasonably drawn therefrom. *Id.*

Mr. Hambleton was charged with the crimes as either a principal or an accomplice. And while the evidence suggested the involvement of others in the theft of the service truck at a minimum, there was ample circumstantial evidence of Mr. Hambleton's involvement in both crimes.

The State proved he was one of four employees (apart from Mr. McFarland) who knew where the keys to the service truck were located. Mr. Hambleton's van was found outside RJ Mac's shortly after the service truck was taken, in a frost-free condition suggesting it had not been there long. He was found later that night a half-mile from the office building and provided officers with two versions of who let him out at roadside, which neither Ms. Huey nor Ms. Osborne would back up. All the other employees who knew where the keys were had an alibi.

The elements of a crime can be established by both direct and circumstantial evidence. Circumstantial evidence is considered just as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). There was sufficient evidence to support the State's theory that Mr. Hambleton unlawfully entered RJ Mac's after hours,

11

used the warehouse keys to obtain access to the generators, and used the service truck

keys to steal the truck himself or assist someone else in stealing it.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds for review (SAG), Mr. Hambleton

raises five.

*Failure to authenticate photographs.* Mr. Hambleton argues the trial court abused

its discretion when it admitted photographs of generators without the authentication

required by ER 901(a). That rule provides that the requirement of authentication or

identification as a condition precedent to admissibility "is satisfied by evidence sufficient

to support a finding that the matter in question is what its proponent claims."

We review a trial court's decision to admit or exclude evidence for abuse of

discretion. A trial court abuses its discretion when its evidentiary ruling is based on

untenable grounds or reasons. *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001).

Photographs are often offered to provide the trier of fact with a portrayal of the

specific location where events took place or a specific object used or possessed by

persons involved in the case. Authentication of a photograph offered for that purpose

requires that the proponent "put forward a witness 'able to give some indication as to

when, where, and under what circumstances the photograph was taken, and that the

photograph accurately portrays the subject illustrated.'" *State v. Sapp*, 182 Wn. App.

910, 914, 332 P.3d 1058 (2014) (quoting *Tate v. Newman*, 4 Wn. App. 588, 593, 484

12

No. 31862-1-III
*State v. Hambleton*

P.2d 473 (1971).

Here, however, the State offered the photographs not as depicting any particular generators, but merely to show that Mr. Hambleton was interested enough in generators to store pictures of them on his cell phone. The authentication required for that purpose was evidence that the photographs existed on Mr. Hambleton's cell phone at the time it came into law enforcement custody. The State presented such evidence in the form of testimony about the chain of custody, the extraction of data from the phone by a specially trained detective, and Detective Gregory's testimony that the printouts marked as exhibits accurately reflected the photographs extracted from the cell phone. The authentication was sufficient.

*Admissibility of photographs under ER 401, 403, and 404(b).* Mr. Hambleton also contends the photographs of the generators were not relevant and, if relevant, their probative value was outweighed by the danger of unfair prejudice.

"Relevant evidence" is evidence tending "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." ER 401 (internal quotation marks omitted). Where other evidence suggested that RJ Mac's premises were burglarized and its service truck stolen in order to steal the BNSF generators, the fact that Mr. Hambleton had photographs of generators on his cell phone made it more probable that he was involved in the burglary and theft than if he did not have such photographs on his phone.

13

Mr. Hambleton objected at trial that the photographs were inadmissible under ER 403. ER 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." It was Mr. Hambleton's position that because the State had not charged him with theft of the generators, its only possible reason for offering the photographs was a prejudicial one: to suggest he was involved in an uncharged crime. The court expressed its view that a formal charge was not necessary to make the photographs relevant. It found them probative because they tended to connect Mr. Hambleton with the burglary and theft of the service truck. We find no abuse of discretion.

Finally, Mr. Hambleton argues for the first time on appeal that the photographs were evidence relevant to the alleged theft of the generators and were therefore inadmissible under ER 404(b). ER 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." It goes on to provide examples of purposes for which evidence of other crimes, wrongs, or acts *is* admissible, the first being to prove motive. The alleged theft of the generators is contended to be the reason for a service truck theft and burglary that otherwise yielded no criminal gain.

In any event, since ER 404(b) was not relied on in the trial court as a basis for objection, the objection is waived. RAP 2.5(a)(3). "An evidentiary error, such as erroneous admission of ER 404(b) evidence, is not of constitutional magnitude." *State v.*

14

*Powell*, 166 Wn.2d 73, 84, 206 P.3d 321 (2009). It cannot be raised for the first time on appeal and we will not consider it further.

*Speedy trial right.* Mr. Hambleton contends his right to a speedy trial under CrR 3.3(b)(1) was violated. His argument proceeds from his premise, "I never signed a waiver of my right to fast & speedy trial." SAG at 6. But the record on appeal includes a "Stipulation for Continuance Waiver of Time for Trial [and] (CrR 3.3) Order of Continuance" signed by Mr. Hambleton, his lawyer, and the prosecutor on March 19, 2013. CP at 179. Based on the waiver, the court continued the trial scheduled for March 27 to May 29.

On May 21, the State moved to continue the trial date to June 12, noting there was a 30-day buffer period as a result of the stipulated continuance. The court granted the motion. Trial began within the buffer period, on June 26.

*Evidence of criminal history.* Mr. Hambleton complains of three instances in which he claims jurors heard information about his criminal history. Through motions in limine, he had asked the court to exclude "[a]llegations of prior bad acts by the defendant as prohibited by ER 404(b)" and "[a]ny and all evidence concerning any prior traffic citations and/or criminal convictions of the defendant. ER 402, 403, and 609." CP at 171.

First, he contends the trial court abused its discretion when it permitted his criminal history to be discussed with a potential juror in front of the venire during voir

15

dire. The court did not "permit" such questioning. Rather, when Mr. Hambleton's lawyer questioned a potential juror who worked as a corrections officer and had made statements on his juror questionnaire casting doubt on his impartiality,[6] the potential juror speculated that Mr. Hambleton had a criminal history. He said:

> Well, if somebody's got a history of this, they don't necessarily change. I think that should all be incorporated. So, I think I might have a hard time being non biased. Quite frankly, I don't recall Mr. Hambleton. He looks vaguely familiar, but we've got over 2,000 people incarcerated just in this facility.

RP (Voir Dire) at 58. Mr. Hambleton's lawyer moved to excuse the potential juror for cause, the State did not disagree, and the court excused him. No other relief was requested by the defense and Mr. Hambleton presents no basis on which the court, sua sponte, should have done anything more.

Next, when Ms. Osborne was called to testify and the State began to ask why Mr. Hambleton and she did not go to a casino in Oregon on the night of the burglary, Mr. Hambleton's lawyer requested a sidebar and expressed concern that she would testify to conditions of Mr. Hambleton's probation. The court instructed the prosecutor to lead the witness, to avoid the probation issue. But the following exchange took place,

> [PROSECUTOR]: All right. So, it didn't work out, then, for you to go to Oregon, correct?

---

[6] According to the transcript, the summoned correction officer had written, in part, "Working in the business and would like to convict criminals. Job security!" RP (Voir Dire) at 56-57.

16

[MS. OSBORNE]: I had just mentioned that I wanted to go to Hermiston. I go there frequently to go gambling, and *he said he couldn't leave the county.*
[PROSECUTOR]: Okay. All right. So, he—
[DEFENSE COUNSEL]: Objection. I ask the last matter be stricken.
THE COURT: I'll grant that.

RP (Trial and Sentencing) at 251 (emphasis added).

Here again, Mr. Hambleton does not identify what more the trial court should have done and we find no abuse of discretion.

Finally, during cross-examination, defense counsel asked:

[DEFENSE COUNSEL]: But up until your birthday on January 1st of—your birthday on January 1st you hadn't seen [Mr. Hambleton] for some time; is that right?
[MS. OSBORNE]: Correct. He'd been incarcerated for many years.
[DEFENSE COUNSEL]: Objection. I'd ask that that last statement be stricken and—
THE COURT: Overruled. You asked the question.

*Id.* at 257. Later, outside the presence of the jury, the court explained that it denied the motion to strike because the defense had moved to exclude criminal history but not the fact of Mr. Hambleton's incarceration, and Ms. Osborne's answer was not nonresponsive. The court's ruling was not manifestly unreasonable.

*Jury instruction.* Finally, Mr. Hambleton contends the State's proposed jury instruction relieved it of the burden to prove every element of the crime charged because it mistakenly provided "[t]o convict the defendant of the crime of Burglary in the *first degree*," when Mr. Hambleton was charged with burglary in the second degree. SAG at

17

No. 31862-1-III
*State v. Hambleton*

16 (emphasis added).

Mr. Hambleton is mistaken. The instruction the court provided the jury reads, "To convict the defendant of the crime of burglary in the second degree. . . ." CP at 103. There was no error.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, C.J.