STATE of Minnesota, Respondent,

v.

Lloyd Allen HANLEY, Appellant.

No. CO–83–630.

Supreme Court of Minnesota.

Feb. 15, 1985.

Rehearing Denied March 30, 1985.

Robert D. Goodell, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Robert M.A. Johnson, Anoka County Atty., J. Diane Savage, Asst. Anoka County Atty., Anoka, for respondent.

## OPINION

KELLEY, Justice.

The appellant, Lloyd Allen Hanley, was convicted of committing the first degree murder of David Studler in Anoka County. He here challenges that conviction by claiming that evidence used against him at his trial was illegally seized during a warrantless search of his apartment; that he was denied effective assistance of counsel because of alleged conduct of jailers in intercepting communications between himself and his attorney; that the trial court erred in admitting statements made by an accomplice into evidence; and that the trial court erred in refusing to instruct the jury that a woman present during part of the evening that the murder was committed was an accomplice as a matter of law. We find all of the appellant's contentions to be meritless, and accordingly affirm.

On March 26, 1982, David Studler was kidnapped, beaten, and taken to a rural area in Anoka County where he was exe-

cuted by shooting.[1] Edward Albrecht, Donald Dahn, Scott Berrisford, and appellant were all originally charged with the crimes.[2] Approximately three months before that date, Donald Dahn's apartment had been burglarized. He and Appellant Hanley suspected David Studler, among others, as being involved in the burglary. Jeanne Gosselin lived in an apartment building across the hall from Appellant Hanley. On the evening of March 25, 1982, she, together with the four men, went to the Clover Club bar where they knew Studler would be. The men persuaded Studler to leave the bar with them. Once outside the bar, the four men commenced to beat and kick Studler. The group then put Studler in the back of Dahn's Pinto and took him to Appellant Hanley's apartment. He was there placed in the trunk of an Oldsmobile driven by Berrisford. The four men then decided to take Studler to Forest Lake. Before the men left, Gosselin asked appellant if he was going to kill Studler and received the reply from appellant, "Only if I don't get the answer I want from him." Gosselin did not go with the four men when they took Studler to a dirt road in Anoka County, removed him from the trunk, beat and kicked him again. After the beating and kicking, appellant stated that he was the "judge, jury and executioner" and instructed Berrisford to carry out the sentencing. Berrisford then shot Studler in the back of the head, and he was left lying in a ditch. Following the execution, and in the panic of leaving the scene, the Oldsmobile was driven off the road and abandoned. The four men then returned to St. Paul in the Pinto. For the remainder of the night and into the day, appellant and Berrisford "kept watch" out of Gosselin's apartment window overlooking an alley and the parking lot of appellant's apartment building. They were arrested on March 27 while trying to leave the building in a car owned by appellant's girlfriend, Sandra Fellman.

1. On March 27, 1982, police officers searched appellant's apartment without first having secured a warrant. The police conducted the search pursuant to consent given by Sandra Fellman. Appellant contends that search was illegal because Fellman did not possess the authority to consent to the search, and that Fellman's consent to the search was not freely and voluntarily given.

(a) The evidence is more than ample to sustain the court's finding that Fellman had sufficient access and control of appellant's apartment to validly consent to the search on Saturday afternoon, March 27, 1982. On that day, two St. Paul police officers were asked to ascertain if Appellant Hanley lived in the apartment building at 1396 White Bear Avenue. In checking the mailboxes at that apartment building, they found the names of Sandra Fellman and Appellant Hanley on the mailbox for Apartment 1. Shortly thereafter, they noted an American Motor's car registered to Fellman, containing two occupants resembling descriptions given to them of Berrisford and appellant, begin to drive away from the apartment complex. They stopped that vehicle. Berrisford and appellant were arrested. While this activity was occurring, Sandra Fellman came out of the building several times. The officers then went to Apartment 1 and sought permission from Fellman to look around the apartment. She agreed and informed the officers that she lived there. She was asked if she would sign a consent to search form. She was told that she did not have to do so, but that it would be nice if she would cooperate. Without objection, she agreed and then did sign the form in the

---

1. The general facts surrounding the incident are set forth in *State v. Berrisford*, 361 N.W.2d 846 (1985), and, therefore except those facts relevant to the disposition of the issues here raised, will not be restated.

2. Before the trial of this case, Albrecht pleaded guilty to murder in the second degree in ex-

change for his testimony at the trials of the other three. Berrisford was found guilty of first degree murder, and his conviction was affirmed. *See State v. Berrisford*, 361 N.W.2d 846 (1985). Following Appellant Hanley's conviction, Dahn pled guilty to second degree murder.

presence of the officers. Though they did not conduct a full search, the officers did look around the apartment and observed some weapons therein. An officer was left to secure the apartment until a search warrant could be obtained.

Shortly thereafter, Investigator Terry Larkin of the Anoka County Major Crime Investigation Unit arrived at the apartment. Although he was informed that Fellman had signed the consent to search form, he proceeded to question her further in detail about her living situation to determine whether she did have the authority to consent to a search of appellant's apartment. Fellman's answers revealed she was living with appellant although she also lived occasionally with her mother. For a number of months she had been paying the rent on appellant's apartment and produced for Larkin's inspection a check register and cancelled checks demonstrating that she, in fact, paid the rent on the apartment up to and including the rent due in March. She told Larkin she kept clothing and jewelry at the apartment and produced a letter addressed to her at that apartment. Fellman was informed by Larkin that if she continued to give consent, anything found in the apartment could be used in court against Appellant Hanley. She was also informed that Larkin could get a search warrant. When again asked if she would consent, she replied, "Fine, go ahead." Investigator Larkin then took a taped statement, later transcribed and signed by Fellman. This taped statement confirmed the facts she had previously related relative to her living arrangements in the apartment. Larkin then searched this apartment. Three days later the apartment was again searched pursuant to a warrant. At that time additional evidence was seized, including white cotton rope similar to the rope used to bind Studler. At the omnibus hearing, contrary to what she had told the officers on March 27, Fellman claimed she was only a guest at appellant's apartment, and claimed she consented to the search because she felt the officers would have searched the apartment even if she had withheld assent. She did, however, admit that she had a key to the apartment, that she had consented to the search, and that she at all times understood her rights.

■ It is well settled under the Fourth and Fourteenth Amendments to the United States Constitution that a search conducted without a warrant issued upon probable cause is *"per se"* unreasonable * * * subject only to a few specifically established and well delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971). It is equally well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). Moreover, a number of cases hold that under certain circumstances a third party can validly consent to a search of a defendant's premises or effects. *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *State v. Martin,* 261 N.W.2d 341 (Minn.1977). The leading case of *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), sets forth the test to be applied:

> [W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who *possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.*

*Matlock,* 415 U.S. at 171, 94 S.Ct. at 993 (emphasis added). The Court in *Matlock, supra,* further defined the term "common authority":

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. *The authority which justifies the third-party consent* does not rest upon the law of property, with its attendant historical and legal refinements * * * but *rests*

rather on *mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.*

*Matlock,* 415 U.S. at 171, n. 7, 94 S.Ct. at 993 n. 7 (emphasis added).

■ The evidence stated above clearly demonstrates that Sandra Fellman possessed "common authority over" or a "sufficient relationship to the premises" within the language of *Matlock, supra,* to validly consent to the search. She was present at the time of the search. Her name was on the mailbox along with that of appellant. She possessed a key to the residence. Her clothing and jewelry were there. She told Investigator Larkin and the St. Paul police that she lived there off and on for over a year. She had been paying the rent for over a year, with the last rent check paid on March 15, 1982. This evidence more than amply justifies the omnibus court's findings of sufficient access and control of the apartment to validate her consent to the search.

■ (b) We now address appellant's contention that Sandra Fellman's consent was not freely and voluntarily given. In order for a consent search to be valid, the state must establish that the decision to consent was made freely and voluntarily. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). Whether consent was voluntary, and not the result of duress or coercion, is to be determined from the totality of circumstances, and while the subject's right to refuse is a factor to be taken into account, the prosecution need not demonstrate such knowledge as a prerequisite to establishing voluntary consent. *Id.,* at 249, 93 S.Ct. at 2059.

■ Appellant contends that Fellman's consent was not made "freely and voluntarily of her own free will and accord." Appellant maintains that under the circum-

stances she was induced to consent to a search by the officers' remarks that a search of the apartment was inevitable. However, this argument rests upon a perversion and partial view of the facts. The testimony adduced in the suppression hearing reveals that the St. Paul police and Investigator Larkin did not threaten to obtain a search warrant; they merely stated that a search warrant would be or could be obtained on the premises since appellant was arrested leaving that apartment. Moreover, it is clear from the facts that they had probable cause to support an application for a search warrant. The agent's assertions under the circumstances were not impermissibly coercive. *See United States v. Raines,* 536 F.2d 796, 801 (8th Cir.1976). In addition, Fellman acknowledged in the taped statement that no threats were made in order to obtain her consent to search. She also signed of her own free will a consent to search form, stating in part that her consent was freely and voluntarily given. Finally, the prosecution established that Fellman continued to consent *after* she was advised of her right to refuse, a requirement that has *not* yet been mandated by the United States Supreme Court. The officers did not threaten to obtain a search or arrest warrant if consent were withheld. *See, e.g., United States v. Boukater,* 409 F.2d 537, 538 (5th Cir.1969). There also has been no showing that Fellman lacked the maturity, sophistication, or intelligence to give an effective consent, *see, e.g., United States v. Mayes,* 552 F.2d 729, 732 (6th Cir.1977), nor is there any indication that Fellman was unaware of her right to withhold consent. Accordingly, in these particular circumstances, a holding that Fellman's consent was not coerced is amply supported in the evidence.

Because the search of appellant's apartment on March 27, 1982, was lawfully executed pursuant to Sandra Fellman's authorized and voluntary consent, it follows that the subsequent warranted search on March 30, 1982, was not tainted. Consequently,

evidence seized during both searches was properly admitted at the trial.

■ 2. Appellant alleges that certain of his mail was sealed with scotch tape and that conferences between his attorney and himself were held in a room equipped with a concealed mirror. From these claims, he concludes that he was denied effective assistance of counsel and due process of law.

There is nothing in the record to show that the state intercepted any privileged conversation between appellant and his attorney in the jail, nor is there any evidence that any alleged intercepted conversations were used in his trial. The record does show that the trial court ordered the prosecutor to investigate those allegations. The prosecutor did so, and informed counsel and the court that he could ascertain no interceptions. Moreover, the prosecutor provided to the court letters from officers which categorically denied that they had intercepted any communications and positively asserted that they had no knowledge that any communication between appellant and his counsel had ever been intercepted. This is not a case like either *O'Brien v. United States*, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967) or *Black v. United States*, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966) where, without question, certain communications had been intercepted. Here, all court orders made to determine whether, in fact, any communications were intercepted were fully complied with by the prosecutor. We conclude appellant's contention in this regard is meritless.

3. Appellant next asserts that the trial judge erred in permitting the prosecutor to introduce certain statements made to an investigating police officer by Scott Berrisford shortly after his arrest. Appellant claims the statements were hearsay and deprived him of his right of confrontation of witnesses guaranteed by the Sixth Amendment to the United States Constitution.

■ A police investigator was permitted to testify that Berrisford stated (1) he had been at the Clover Club, had dropped off Carol Blessner's car (the Oldsmobile) at her house and hitchhiked to appellant's apartment where he observed appellant and Dahn playing cribbage; (2) that Berrisford identified a photo of Studler as a person he had seen at the Clover Club; and (3) that Berrisford stated, "I am not saying anything happened, but if I was drunk and I was forced into it, what would it be as far as a charge is concerned." The respondent argues the last statement was not hearsay because it was not offered to prove the truth of the matter asserted. We agree. *See* Minn.R.Evid. 801(c). The comments to that rule state that "If the out of court statement is being offered for some other purpose, such as to prove knowledge, notice or for impeachment purposes, it is not hearsay." Here, Berrisford's statement was not offered to prove the truth of the matter stated but rather to show that he lied to the police. The record establishes that the prosecutor used the statement in his closing argument to demonstrate that Berrisford, like the other three men involved, was denying his guilt. Since the prosecutor was not proffering the out of court statement for its truth, it was not hearsay. *See State v. Hudson*, 281 N.W.2d 870 (Minn.1979).

■ At trial, appellant failed to raise the claim that admission of the statement violated the Sixth Amendment right of confrontation. By that failure he forfeited his right to have this court consider the issue on appeal. *State v. Hudson* (supra), 281 N.W.2d at 873; *State v. Beard*, 288 N.W.2d 717, 718 (Minn.1980).

4. Finally, appellant asserts the trial court erred in failing to instruct the jury that Jeanne Gosselin was an accomplice as a matter of law. Instead, the trial court informed the jury that it was for it to decide whether Gosselin was an accomplice. The jury was told that if another witness was a person who could be charged with the same crime as the accused, it could not find the accused guilty on that witness's testimony unless his/her testimony was corroborated by other evidence. The court then thoroughly explained to the jury what

evidence was necessary to corroborate accomplice testimony.

▆▆▆▆ We reject both appellant's contention that Gosselin was an accomplice as a matter of law and that there was insufficient evidence corroborating her testimony. Unless the facts are undisputed or compel but a single inference, whether a witness is an accomplice is a question for jury resolution. *Tucker v. State*, 309 Minn. 482, 245 N.W.2d 199 (1976). When the evidence tending to connect a witness with the crime is disputed or susceptible to different interpretations, the complicity issue is one of fact for jury resolution. *State v. Jensen*, 289 Minn. 444, 184 N.W.2d 813 (1971); *State v. Hopfe*, 249 Minn. 464, 471, 82 N.W.2d 681, 686 (1957). Here, the evidence fails to conclusively establish that Gosselin was an accomplice. Her testimony is an account of how Studler was lured from the Clover Club and how Berrisford and appellant acted immediately after the murder. She did not participate in the beating, in the abduction to Anoka County, or in the shooting. At no time prior to the murder did she take an active part in planning or execution of this slaying. She knew of no plan for Studler's murder. Admittedly, part of her story may have been suspect with respect to some details, but it was for the jury to weigh her credibility. There was sufficient evidence from which it could have concluded that she was not an intentional participant in the crime of murder.

▆▆▆ Even if the jury had concluded that Gosselin was an accomplice, there was more than sufficient evidence, even apart from the testimony of the accomplice Albrecht, to corroborate her testimony and point to the guilt of Appellant Hanley. For example, the testimony of Tracy Cardinal, Sandra Fellman, and Carol Blessner, as well as portions of appellant's own testimony clearly corroborate Gosselin's testimony.

Finding no error, we affirm appellant's conviction.