**In the Matter of the Welfare of D.A.G.**

**No. C0–91–530.**

Supreme Court of Minnesota.

May 15, 1992.

Hubert H. Humphrey, III, Atty. Gen., Robert A. Stanich, Sp. Asst. Atty. Gen., St. Paul, and Ann L. Carrott, Douglas County Atty., Allen Senstad, Asst. County Atty., Alexandria, for appellant.

Peter Mellom, Gaffaney & Velde Law Firm, Ltd., Alexandria, for respondent.

YETKA, Justice.

The state appeals from a court of appeals' decision affirming a trial court order which suppressed evidence on the basis of an unreasonable, warrantless search and seizure, 474 N.W.2d 419. We affirm the decisions of the courts below.

At about 3:45 p.m. on August 30, 1990, Deputy Brian Nielson of the Douglas County Sheriff's Department contacted Officer Larry Dailey of the Alexandria Police Department regarding information about a large quantity of marijuana at 1002 Hawthorne in Alexandria. Nielson received the information from Thomas Charles Howard, who had appeared at the sheriff's department on his own initiative. Officer Dailey agreed to go to the Alexandria Police Department to interview Howard about the drugs.

During the interview with Officers Dailey and Nielson, Howard told the officers that he had recently moved into 1002 Hawthorne with D.A.G. and another individual. Howard stated that, in the early morning hours of August 30, 1990, Michael Ray Erickson came to the house and asked Howard's friend, Cory Keller, if he could use Keller's vehicle to pick up a package located at a rest area near Alexandria. Keller lent his car to Dat Quang, who

drove Erickson to the rest area. After Erickson and Quang left, D.A.G. informed Howard that Erickson was going to pick up approximately 2 pounds of marijuana. Howard stated that Erickson was a "known drug dealer."

Erickson and Quang returned to 1002 Hawthorne at about 4:00 a.m. on August 30. Howard stated that Erickson had a large amount of marijuana when he returned to the house. Howard knew it was marijuana because, as a former user, he recognized the drug by sight and smell.

Howard expressed to Erickson and D.A.G. his extreme displeasure that Erickson had brought the drugs into the house. Howard then left the residence. When Howard returned to the house later in the morning, he found Erickson still present. By this time, however, Erickson had apportioned the marijuana in clear plastic baggies and stuffed them into his "black leather, motorcycle type jacket."

Based on Howard's status as a cotenant and the foregoing information,[1] the officers "decided to obtain permission to search" the residence at 1002 Hawthorne. Howard signed a standard "Permission to Search" form at 4:54 p.m. on August 30. Three Alexandria police officers and two Douglas County deputy sheriffs conducted the "raid" shortly after Howard signed the consent form. Howard did not accompany the officers on the raid.

The officers did not obtain a search warrant because they believed Howard's consent authorized a warrantless search of the residence. Officer Dailey testified that he believed he had probable cause to search the house for drugs based on the information Howard had given him. The officers did not knock and announce their purpose and authority when they entered the residence; rather, they "walked in" with their guns drawn. Finally, although D.A.G. was present when the officers entered the house, they did not ask D.A.G. for permission to search the house.

---

1. It is not clear what Howard told the officers before they raided and searched the house. Howard's recorded statement, upon which the police report appears to be based, was made *after* the raid took place.

During the search of the residence, the officers found a black leather jacket like the one Howard had described to them. In it, the officers found several baggies of marijuana. Michael Ray Erickson identified the jacket and its contents as his. The police also found some marijuana in a canister in the kitchen. In total, the police found approximately ½ pound of marijuana.

Finally, the officers recovered an illegal sawed-off 20–gauge shotgun, the evidence at issue in this case. The shotgun was in plain view in the living room of the residence. In a statement to the police after the raid, D.A.G. admitted that he owned the gun and knew its length was unlawful. On September 21, 1990, D.A.G. was charged, by way of delinquency petition, with violating Minn.Stat. § 609.67, subd. 2 (possession of a short-barreled shotgun) and Minn.Stat. § 260.015, subd. 5(a) (delinquency).

We begin our inquiry into the validity of the search with the proposition that, under the fourth and fourteenth amendments to the United States Constitution and article I, section 10 of the Minnesota Constitution, any search of a private dwelling conducted without a warrant issued upon probable cause is " 'per se unreasonable ... subject only to a few specifically established and well delineated exceptions.' " *State v. Hanley*, 363 N.W.2d 735, 738 (Minn.1985), *reh'g denied* (Minn., Mar. 30, 1985) (*quoting Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)); *see also O'Connor v. Johnson*, 287 N.W.2d 400, 405 (Minn.1979) (discussing greater protections of article I, section 10 of the Minnesota Constitution). A suspect's own consent to the search of his or her premises is one well-established exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). It is also well established that a third party having common authority over premises or

effects may consent to a search even though the person with whom that authority is shared is absent and does not consent. *United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *see also State v. Buschkopf*, 373 N.W.2d 756, 766–67 (Minn.1985).

■ The court of appeals correctly concluded that this case does not involve the question of whether Howard had authority to consent. Without question, as a cotenant with "common authority"[2] over the premises, Howard had actual authority to consent to a search of the common areas of the apartment. *See Buschkopf*, 373 N.W.2d at 767; *Hanley*, 363 N.W.2d at 738–39. Likewise, this case does not present the question of what should happen when police are confronted with the consent of one present joint occupant and the objection of another present joint occupant. Rather, we agree that this case involves the competing rights of an absent, consenting cotenant and those of a present, objecting cotenant.

Both the trial court and the court of appeals relied on Justice Traynor's analysis in *Tompkins v. Superior Court*, 59 Cal.2d 65, 27 Cal.Rptr. 889, 892, 378 P.2d 113, 116 (1963) to support their holdings:

> [O]ne joint occupant who is away from the premises may not authorize police officers to enter and search the premises over the objection of another joint occupant who is present at the time, at least where * * * no prior warning is given, no emergency exists, and the officer fails even to disclose his purpose to the occupant who is present or to inform him that he has the consent of the absent occupant to enter.

*Id.; accord Silva v. State*, 344 So.2d 559 (Fla.1977) (following *Tompkins* rationale); *Dorsey v. State*, 2 Md.App. 40, 232 A.2d 900 (1967) (same); *State v. Leach*, 113 Wash.2d 735, 782 P.2d 1035 (1989) (same). *But see People v. Cosme*, 48 N.Y.2d 286,

---

**2.** Common authority * * * rests * * * on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7.

422 N.Y.S.2d 652, 397 N.E.2d 1319 (1979) (consent of absent cotenant effective against objecting present cotenant); *State v. Frame*, 45 Or.App. 723, 609 P.2d 830 (1980), *cert. denied*, 450 U.S. 968, 101 S.Ct. 1486, 67 L.Ed.2d 617 (1981) (same).

The *Tompkins* case, however, does not stand solely for the proposition that a present joint occupant's right to refuse consent is superior to or otherwise overrides an absent joint occupant's right to consent to a search; rather,

> [t]he most critical fact [in *Tompkins*] is not that the present tenant objected, but rather that the consent was by an absent tenant and that the officer never made this known to the other occupant. * * * The basis of *Tompkins*, then, is that one joint occupant cannot give a consent which will have the effect of permitting an intrusion upon that part of another occupant's privacy which entitles him to be free of unannounced intrusion and its attendant dangers.

3 W. LaFave, *Search and Seizure*, § 8.3(d) at 250–51 (2d ed. 1987) (footnotes omitted). Under this analysis, the inquiry in the instant case must focus on whether, in the absence of exigent circumstances, the police must knock and announce their authority and purpose prior to entry when conducting a search pursuant to an absent third party's consent. *See id.* at 250. However, we do not reach the issue of whether the police were required to knock and announce their authority and purpose in this case because we think the search cannot be upheld on either consent or exigent-circumstances grounds.

The reasons often given to support searches conducted pursuant to a third party's consent when the defendant is absent or unavailable (and the third party is present) are that (1) the third party is waiving his own rights and not those of the defendant, and (2) the defendant has assumed the risk that the third person will waive his constitutional rights. *See Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7; Wefing & Miles, *Consent Searches and the Fourth Amendment: Voluntariness and Third Party Problems*, 5 Seton Hall L.Rev. 211, 279 (1974).

The "waiver" and "assumption of risk" rationales, however, are not compelling in a case such as this where the person against whom the search is directed is present and the consenting joint occupant is not. First, an absent third party's consent should not be used to "waive" another individual's constitutional rights when that individual is present at the search to give or withhold consent in his or her own right. Similarly, the risk that one co-inhabitant might permit the common area of a jointly occupied premises to be searched in the absence of another is qualitatively different from the risk that a warrantless search will be conducted over the objection of a present joint occupant: A present, objecting joint occupant cannot be said to have assumed the risk that an absent third party will vicariously waive his or her constitutional rights. We agree that "the risk assumed by joint occupancy is merely an inability to control access to the premises during one's absence." 3 W. LaFave, *Search and Seizure* § 8.3(d) at 252 (2d ed. 1987). We do not, however, decide what the result would be where both consenting and non-consenting joint occupants are present when the police request permission to search a premises.

Thus, we conclude that, in a competition between an absent cotenant's right to consent to a search and another cotenant's constitutional right to be free from that warrantless search, the constitutional right must prevail. In this case, Howard's consent to search was subordinate to D.A.G.'s right to object to that search because D.A.G. was present and able to object to the warrantless search.

■ Nor do we believe the search can be upheld on exigent-circumstances grounds. If there had been "exigent circumstances," then the police would not have needed Howard's consent to search without a warrant:

> [T]he existence of an emergency obviates the need for third party consent, [so consent] is not necessary in emergency situations. If there is probable cause and no emergency, the police can get a warrant. If there is no probable cause, it is doubt-

ful whether the search should be permitted. \* \* \* At the very least, the police should be expected to wait until the person against whom they wish to direct the search is available to give or withhold consent.

Wefing & Miles, *supra* p. 6 at 282 (footnotes omitted). Here, the state would have it both ways: If the consent was not valid, then exigent circumstances justified the warrantless search. We cannot agree. The facts the police had before and at the time of the search did not establish exigent circumstances to execute a warrantless search.

At the outset, we note that we make our own evaluation of the found facts in determining whether exigent circumstances exist. *State v. Gray*, 456 N.W.2d 251, 256 (Minn.1990), *reh'g denied* (Minn., July 9, 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 687, 112 L.Ed.2d 678 (1991). In making that determination, we have employed two types of tests. *Id.* First, there is the "single factor" test, where the existence of one fact alone creates exigent circumstances. Thus, we have noted that the "hot pursuit of a fleeing felon, imminent destruction or removal of evidence, protection of human life, likely escape of the suspect, and fire" may justify a warrantless search and seizure. *Id.* (citations omitted).

Here, the only single factor that approximates exigent circumstances is the state's assertion that evidence was in danger of imminent destruction. However, the state has not advanced a theory as to how the 2 pounds of marijuana the officers thought was present, or the ½ pound that actually was present, would have suddenly disappeared. We think the state has wholly failed to provide facts to support the existence of exigent circumstances under the "single factor" test.

However, we have also held that, when none of the single-factor exigent circumstances is clearly implicated, we apply a "totality of the circumstances" test using the following factors as a guide:
(a) whether a grave or violent offense is involved; (b) whether the suspect is rea-sonably believed to be armed; (c) whether there is strong probable cause connecting the suspect to the offense; (d) whether police have strong reason to believe the suspect is on the premises; (e) whether it is likely the suspect will escape if not swiftly apprehended; and (f) whether peaceable entry was made.

*Id.* (*citing Dorman v. United States*, 435 F.2d 385, 392–93 (D.C.Cir.1970)). These factors are not exhaustive, however, and we consider other factors such as the time necessary to get a warrant. *Id.* at 256. Finally, in the warrantless-arrest context, we have distinguished between those arrests "planned" in advance and those which occurred in the "field" as part of unfolding developments. *Id.* at 256–57.

Applying all of these considerations to the facts known by the police before and at the time of the raid, we think the police could and should have obtained a warrant for the search of 1002 Hawthorne. First, the possession of marijuana is not a "grave and violent offense" in the same sense as was an "execution-type murder" in *Gray*. *Id.* at 256. Second, the police had no reason to believe that Erickson or anyone else at the residence was armed. Third and fourth, although the information that Howard provided may have established probable cause for the issuance of a search warrant by a neutral judge, it did not constitute the "strong" showing required to conduct a warrantless search. Fifth, the police had no reason to believe that Erickson was likely to escape. In fact, Howard's statement revealed precisely the opposite: When Howard had expressed his displeasure with the presence of Erickson and the marijuana, it was Howard who left, not Erickson. Finally, the officers' entry "with guns drawn" does not constitute peaceable entry under any circumstances.

In addition, we believe the police had sufficient time to obtain a warrant. The officers interviewed Howard at length before the raid. Although it is not clear, at least an hour and possibly an hour and a half elapsed between the time Howard first spoke to Deputy Nielson and the time the raid was executed. Furthermore, Howard

went to the police in the middle of a weekday afternoon when the courts were open and the police could have obtained a warrant. It is the hearing before an impartial judge which protects the constitutional right to be free from warrantless searches. Although there are situations where we must entrust the police with the role of protector and allow them to conduct a warrantless search, they cannot assume this role in every instance or at their own whim.

■ Finally, the only evidence the state has provided to justify a warrantless "field" search is the presence of three juveniles outside the residence at the time the raid was conducted. The officers entered the residence after identifying and releasing them. The police reported nothing suspicious about the juveniles. We do not know if the juveniles were coming from or going to the residence. The officers conducted no surveillance of the residence. Even coupled with the averment that a large amount of marijuana had been brought onto the premises, the presence of the juveniles outside does not constitute exigent circumstances that would have justified a warrantless search in this case.

We understand that law enforcement officials today face difficulties in fighting crime generally and drug trafficking specifically. In our zeal to address those problems, however, we cannot give police unsupervised powers to invade the privacy of our homes. To do so would put our constitutional protections in danger of becoming so eroded as to be meaningless. The protection provided by the warrant requirement of the fourth amendment to the United States Constitution and article I, section 10 of the Minnesota Constitution is that someone skilled in the law and independent in judgment must make the decision as to whether a search may be executed. Exceptions must not abrade the very right itself. We agree with the trial court that "[n]o reason, except inconvenience of the officers and delay in preparing papers and getting before a magistrate, appears for the failure to seek a search warrant. But those reasons are no justification for by-passing the constitutional requirement \* \* \*." *Mc-*

*Donald v. United States,* 335 U.S. 451, 455, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948).

Finally, most scholars agree that ratification of the Constitution depended on the adoption of the Bill of Rights. The liberties protected in those ten amendments, including the right to be free from unreasonable searches and seizures, are not mere words that can be arbitrarily applied and ignored. Rather, the fourth amendment was intended to vest in our Constitution a right which the English had acquired only after nearly a thousand years. The fact that article I, section 10 of the Minnesota Constitution and the fourth amendment of the United States Constitution are identical reflects the importance of this right.

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend. IV; Minn. Const. art. I, § 10.

Thus, we hold that, under the Minnesota and United States Constitutions, the search was unreasonable and the evidence was properly suppressed in this case. First, Howard's consent to search was subordinate to D.A.G.'s right to object to the warrantless search of his residence at the time of that search. Finally, no exigent circumstances excused the officers' failure to obtain a search warrant under the facts in this case.

The decisions of the trial court and the court of appeals are affirmed.