STATE of Minnesota, Appellant,

v.

Kevin Clayton BLACKSTEN,
Respondent.

No. C0-92-621.

Court of Appeals of Minnesota.

Aug. 4, 1992.

Review Granted Sept. 30, 1992.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, James A. Terwedo, Scott County Atty., Thomas J. Harbinson, Neil Nelson, Asst. Scott County Attys., Shakopee, for appellant.

John M. Stuart, Minn. State Public Defender, Mark D. Nyvold, Sp. Asst. Public Defender, St. Paul, for respondent.

Considered and decided by HARTEN, P.J., and KALITOWSKI and FOLEY,* JJ.

## OPINION

HARTEN, Judge.

This appeal is from a pretrial order suppressing evidence and dismissing charges of aggravated robbery for lack of probable cause. We affirm in part, reverse in part and remand.

## FACTS

A New Prague gas station was robbed January 21, 1992. Station employees described the robbers as two white males wearing snowmobile helmets and ski masks, one carrying a shotgun. Police found two sets of shoe prints, one from cowboy boots and the other from tennis shoes, and a snowmobile trail leading away from the station.

Two days later, New Prague police received a call from a citizen about a suspicious vehicle seen the night of January 21. The citizen, who identified himself, showed police the spot where the apparently abandoned green Pinto had been seen. This location was only 60 feet from where the snowmobile tracks from the station had led, and where the snowmobile, later discovered to have been stolen, was found. The citizen had written down the license number which, with the transposition of two letters, was discovered to be for a car registered to James Otis.

Police located Otis' Pinto, looked inside and saw two snowmobile helmets. Shortly after, Otis entered the vehicle with Jill Helmer, and drove off, leading officers on a high speed chase. Helmer told police that she asked Otis what was going on and he said he "got in trouble again" and that it involved a robbery.

Helmer was discovered to have a bottle of Tylenol III prescribed to respondent Kevin Clayton Blacksten. She told police that Blacksten usually called Otis once a day. She said that Otis was with Blacksten from around noon on January 21, and that Otis did not return to the apartment until 5:00 a.m. the following day.

Police knew Blacksten had a prior robbery conviction. They also had information that Blacksten and Otis were involved in a 1985 armed robbery involving the use of a snowmobile, although testimony at the omnibus hearing indicates only Otis may have been involved in that offense.

Police began preparation of a search warrant for Blacksten's person and his residence late in the afternoon of January 23, 1992. Investigator Dave Menden was sent to conduct surveillance at Blacksten's residence. Menden had watched the house for about 30 minutes when he saw a vehicle drive away. Menden thought that the party leaving was Blacksten, and followed the car because he wanted "to contain him until we did the search warrant."

At a gas station a couple miles from Blacksten's residence, Menden stopped and detained Blacksten. After being searched, Blacksten was placed in the locked back seat of a squad car. When Blacksten asked why he was stopped, Menden told Blacksten that he did not want to discuss the reason for the stop because other officers who were more closely involved would have the details.

When Menden learned that it would be some time before the search warrant was submitted and signed, he told Blacksten that the stop was in relation to a search warrant, and that it involved an armed robbery. Menden testified that at this point, Blacksten held up his arm, which was in a cast, and asked "How could I do [it]?"

Menden testified that after being told the search warrant was in connection with an armed robbery, Blacksten volunteered to have police search his car. Blacksten

---

* Retired judge of the Court of Appeals, acting by appointment pursuant to Minn.Const. art. VI, section 2.

signed a consent to search, which had been read to him. Inside the vehicle, Menden found a Polaris Indy snowmobile cover, which was later identified by the owner of the stolen snowmobile allegedly used in the robbery.

Blacksten was stopped at about 6:15 p.m. When the search warrant was signed, a detective went to the scene of the stop. He checked the tread on Blacksten's tennis shoes, which appeared similar to the pattern photographed at the scene. Blacksten was arrested and subsequently taken to jail at 7:52 p.m.

## ISSUES

1. Did the trial court clearly err in finding that the stop of Blacksten's vehicle was not supported by articulable suspicion, or by "safety concerns" associated with the anticipated search of Blacksten's residence?

2. Did the trial court clearly err in finding that no valid consent was given for the search of Blacksten's vehicle?

3. Did the court clearly err in suppressing the individual items of evidence?

## ANALYSIS

### I.

The state in a pretrial appeal has the burden of showing

clearly and unequivocally that the trial court erred in its judgment and that, unless reversed, the error will have a critical impact on the outcome of the trial.

*State v. Webber*, 262 N.W.2d 157, 159 (Minn.1977). The state argues that the trial court clearly erred in suppressing the evidence because the stop of Blacksten's vehicle was justified both by articulable suspicion, and by the "safety concerns" of the officers about to execute the search warrant. The trial court found that there was no articulable suspicion for the stop, no probable cause for arrest, and no exigent circumstances justifying the detention.

The standard for an investigative stop is minimal, and requires only that the stop not be the product of "whim, caprice, or idle curiosity." *State v. Combs*, 398 N.W.2d 563, 566 (Minn.1987). If the police have articulable suspicion that a person was involved in a completed felony, they may make a *Terry* stop to investigate that suspicion. *United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985).

Police knew that Blacksten was associated with James Otis, that he had spent some part of the day of the robbery with Otis, that Otis' vehicle had been seen in the vicinity of the robbery, that Otis had been involved in a prior robbery involving use of a snowmobile, and that Otis had fled when police observed his automobile, had led police on a high speed chase and told Helmer he had been involved in a robbery. This information was amply sufficient to provide police with an articulable suspicion of Blacksten's involvement in the January 21, 1992 armed robbery.

Police having articulable suspicion to justify an investigative stop may not exceed the permissible duration of such a stop. In *State v. Moffatt*, 450 N.W.2d 116, 118–19 (Minn.1990), the supreme court held that a 61 minute stop to investigate the possible involvement of the occupants in a recent burglary in the immediate vicinity did not exceed the permissible length of an investigative stop. The court in *Moffatt* noted that there is no absolute limit on the duration of an investigative stop. *Id.* at 119. The court noted that one of the officers in the local police department had to be awakened to aid in the investigation, which included a comparison of the shoe prints of the suspect to prints observable at the burglary scene. The court concluded that the officers acted "reasonably and diligently" in confirming their initial suspicions by an immediate investigation while holding the three suspects under temporary detention for investigative purposes. *Id.*

Here, Menden, who conducted the investigative stop, had no intention of conducting any further investigation while detaining Blacksten. No further investiga-

tion was conducted at the scene of the stop until Detective Wolf arrived at the very end, and compared Blacksten's shoe tread to the photographs of footprints found at the scene. By then, Blacksten had been detained, without any investigative action, for over one hour and fifteen minutes. Thus, the stop was longer than that involved in *Moffatt,* and it had continued without any investigative action.[1]

 The state alternatively argues that the stop was justified as incidental to the execution of the search warrant and supported by the officers' concern for their safety while carrying out the search warrant. Police may detain a suspect during the execution of a search warrant to discover evidence of the offense under suspicion. *See Michigan v. Summers,* 452 U.S. 692, 702–03, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981); *State v. Ailport,* 413 N.W.2d 140, 144 (Minn.App.1987), *pet. for rev. denied* (Minn. Nov. 18, 1987). Such a detention is justified at the scene of the search. *See, e.g., id.* (suspect arrived unexpectedly at motel parking lot while officers were executing search warrant in four motel rooms). The detention is justified by concerns for the safety of the officers, the risk that the suspect will flee if incriminating evidence is found, and the possibility that evidence will be destroyed by the suspect or others. *Id.* The state cites no authority, and we have found none, supporting such a detention at a distance from the site of the execution of the search warrant.

In cases in which a government intrusion serves the safety of police, but in a less direct fashion, the United States Supreme Court has supplied a balancing test weighing the nature of the intrusion against the importance of the government interests served. *See, e.g., New York v. Class,* 475 U.S. 106, 117–18, 106 S.Ct. 960, 967–68, 89 L.Ed.2d 81 (1986). The detention of Blacksten may have provided additional protection for the officers executing the warrant, although the need is less apparent if the suspect is not at the scene. Nevertheless, we would be inclined to apply the balancing test if police had waited until the warrant was signed before detaining Blacksten.

The detention of Blacksten exceeded the permissible length of an investigative stop, occurred far from where the search warrant was to be executed, and began long before the warrant was approved. The trial court did not clearly err in concluding that the stop was illegal.

## II.

 Police obtained Blacksten's consent to search the vehicle. This consent may be valid even though the stop was illegal. *See State v. Hoven,* 269 N.W.2d 849, 853–54 (Minn.1978) (manifestly voluntary consent that is not product of illegal arrest will not be deemed tainted and will fall outside bounds of exclusionary rule), *cited in State v. Hanson,* 364 N.W.2d 786, 789 (Minn. 1985); 3 W. LaFave, *Search & Seizure* § 8.2(d) at 193 (2d ed. 1987) (factors to be considered include whether consent volunteered and not requested by police). Whether a consent to search is voluntary is determined under a totality of the circumstances test. *State v. Hanley,* 363 N.W.2d 735, 739 (Minn.1985).

The atmosphere of Blacksten's detention seems particularly lacking in coercive effect, given Officer Menden's disinterest in any investigation or questioning of Blacksten. However, there was conflicting testimony as to how Blacksten's consent was obtained. The trial court's findings do not resolve this conflict. We must remand for findings on this issue.

1. In *Hensley,* the United States Supreme Court sought "to determine whether police officers may stop and *briefly* detain a person who is the subject of a 'wanted flyer' while they attempt to find out whether an arrest warrant has been issued." *Id.,* 469 U.S. at 223, 105 S.Ct. at 677 (emphasis added). The stop was momentary before police discovered an independent cause for detention—a revolver in Hensley's car. The Court's analysis includes repeated references to the necessary brevity of a stop and detention for investigative purposes. Although the court did not reach the question, it did state that were Hensley picked up and held for the agency that issued the wanted flyer, "such a detention might well be so lengthy or intrusive as to exceed the permissible limits of a *Terry* stop." *Id.,* 469 U.S. at 235, 105 S.Ct. at 683.

### III.

The trial court found that the state's evidence, after excluding those items suppressed, did not establish probable cause. The court excluded the evidence of Blacksten's shoe tread, his statement made during the stop, the snowmobile cover, and hair samples taken later from Blacksten.

The trial court clearly erred in suppressing the hair samples. Body and hair samples are not suppressible as the fruit of allegedly illegal conduct where they are obtained pursuant to a court order. *State v. Johnson*, 294 N.W.2d 848, 849 (Minn. 1980). About two weeks after the arrest, police obtained a search warrant for samples of Blacksten's facial and head hair. This search warrant was executed at the Scott County jail.

The trial court did not clearly err in suppressing the shoe tread evidence and Blacksten's statement, both of which were fruit of the illegal stop and detention. However, the snowmobile cover was obtained during the search of the vehicle, purportedly with Blacksten's consent. Because we remand on the consent issue, and because the hair samples were improperly suppressed, we must remand for a redetermination of whether there is probable cause to support the offense charged in the complaint.

### DECISION

The trial court did not clearly err in concluding the stop was illegal, or in suppressing the fruits of the stop. The trial court clearly erred in suppressing the hair samples. The issue of whether consent to search the vehicle was voluntarily given is remanded for further findings.

Affirmed in part, reversed in part and remanded.