**FILED**

**MAY 9, 2017**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 33933-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMANDA MARIE TORRES, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — Are special glass locomotive windows, whose composition must meet federal railroad regulations, locomotive "operating mechanisms?" We ask this question in the context of RCW 81.60.080, a fallow statute that criminalizes sabotaging rolling stock. After declining to entertain Amanda Torres' Fourth Amendment challenge to her arrest and confession, we hold that locomotive windows are not operating mechanisms and reverse her conviction for sabotaging rolling stock. We remand for a new trial on this one charge since Torres also damaged air brakes in addition to windows. We affirm other convictions for burglary and malicious mischief.

## FACTS

This appeal arises from the prosecution of Amanda Torres for entry into a fenced railroad yard and vandalism to a locomotive inside the yard. This statement of facts

comes from the trial and a CrR 3.5 confession hearing. We start with some trial testimony.

Between runs, the Yakima Central Railroad parks locomotives inside a locked fence at its Wapato yard. On July 7, 2014, railroad employee Jake Shreves discovered a ransacked locomotive at the Wapato railroad yard. Shreves found the fence bent to allow access for an intruder, garbage strewn about the locomotive, four or five broken windows, and a discharged fire extinguisher. Further investigation revealed shattered glass tops of air gauges.

The Yakima Central locomotive windows housed strong ballistic bullet proof, optically transparent glass that must meet federal regulations. The locomotive air gauges displayed the amount of air applied to engine brakes and measured the air in reserve tanks. Destroyed air gauges render a train unsafe by restricting the operator from determining if the brake system contains sufficient air for braking purposes. The law prohibits the operation of a train that lacks functioning air gauges. At trial, Yakima Central employee Jack Shreves identified the air gauge as part of the operating mechanism of the locomotive. Nevertheless, the gauge may work if the only damage is harm to the glass top. At trial, Shreves recalled no damage to the gauge needles. No witness identified the locomotive windows as operating mechanisms.

After discovering vandalism at the Yakima Central Railroad yard, Jake Shreves contacted law enforcement. Yakima County Deputy Sheriff Sergio Reyna responded to

2

the scene on July 7 at 8:00 a.m. Reyna reviewed and photographed the damage and

unsuccessfully combed for latent fingerprints. With Deputy Reyna present, Shreves

retrieved from the ground an identification card belonging to appellant Amanda Torres.

Shreves handed the card to Deputy Reyna, who drove to the address listed on the card.

An important question on appeal is whether a confession purportedly spoken by

Amanda Torres to Sheriff Deputy Sergio Reyna should be suppressed. The remainder of

the statement of facts comes from a confession suppression hearing.

At 8:30 a.m., on July 7, Sheriff Deputy Sergio Reyna arrived at the Wapato

address on Amanda Torres' identification card. Torres' aunt owned the house. Deputy

Reyna knocked on the residence front door, a young female answered the knock, Reyna

asked the young lady if he could speak to Amanda Torres, and the young female escorted

Reyna to a downstairs bedroom. The identity of the young female and her relationship to

the house looms important in resolving the legality of Deputy Reyna's entry inside the

residence and seizure of Amanda Torres. During the suppression hearing, Torres

identified the female as Isabel Batista, Torres' aunt's daughter-in-law. Torres averred

that Batista was age 13 or 14 on July 7, 2014.

The State presented no testimony to identify the young female who allowed

Sheriff Deputy Sergio Reyna entrance to the Wapato home. Sergio Reyna did not know

the age of the woman, although he recognized her as being "younger." Report of

Proceedings (RP) at 17. Reyna described the youngish woman as being 5'3" or 5'4" in

height.

A curtain, rather than a door, separated the downstairs bedroom from the remainder of the basement, so Deputy Sergio Reyna knocked on a wooden stud and asked to speak to Amanda Torres. A male and female lay on a bed. Torres identified herself and rose from the bed. Amanda Torres and Sergio Reyna's testimony differs as to events thereafter.

According to Amanda Torres, she awoke to Deputy Reyna's knocking and his telling her that he was a sheriff and was looking for Amanda Torres. Torres stumbled out of bed without shoes. She wore basketball shorts and a tank top, an outfit in which she slept.

According to Amanda Torres, Deputy Sergio Reyna took her arm and told her to follow him. Reyna did not allow Torres to completely dress. Torres immediately deemed herself under arrest since Reyna gave her no choice but to obey him. Reyna neither told Torres that she was under arrest or not under arrest. Reyna concedes he possibly grabbed Torres' elbow and escorted her upstairs.

According to Amanda Torres, when the two reached upstairs, Deputy Sergio Reyna asked Torres if the identification card in his possession was Torres' card. Torres responded in the affirmative. Reyna next asked where Torres lost the card. Torres did not respond because of the distraction of Torres' aunt returning home. The aunt asked the reason for Deputy Reyna being inside the home, inquired about who permitted

4

Reyna's entrance, and questioned whether the deputy held a warrant. In response, Reyna escorted an unshod Torres outside.

According to Sheriff Deputy Sergio Reyna, he sat Amanda Torres in the back of his patrol car. He then delivered *Miranda* warnings to Torres and questioned her about damage to the locomotive. Reyna remained outside the car and spoke to Torres with the car door open.

According to Sergio Reyna, after he read the *Miranda* warnings, Amanda Torres admitted to being present at the railroad yard with friends and conceded that she and her friends had imbibed strong drink. Torres refused to be a snitch on her friends. Torres did not expressly admit to damaging the locomotive, but volunteered to take responsibility for the damage. Torres never cried and never asked for assistance of a lawyer. Reyna's patrol car contained a voice recorder, but Reyna chose not to record the conversation. During the conversation, Amanda Torres' boyfriend walked toward the car with Torres' shoes in hand. Reyna closed the car door to prevent the boyfriend access to Torres.

According to Amanda Torres, Deputy Sergio Reyna questioned her for ten minutes as she sat in the patrol car. Reyna stood outside the car, and the two spoke with the door closed and locked, but the window halfway down. Reyna never read Torres the *Miranda* warnings. The deputy spoke to her as if she was guilty.

According to Amanda Torres, Sergio Reyna claimed a videotape showed Torres damaging the locomotive and asserted that he gathered Torres' fingerprints at the scene.

Reyna also declared that Torres' identification card lay inside the locomotive. Reyna asked Torres why she wreaked the damage. Torres responded that she knew not about any damage to a train. Torres cried and asked for a lawyer. She never confessed to drinking alcohol or volunteered responsibility for damage to the locomotive. She never uttered that she wished not to be a snitch.

PROCEDURE

The State of Washington charged Amanda Torres with sabotage of rolling stock, second degree malicious mischief, and second degree burglary. The trial court conducted a CrR 3.5 hearing to determine whether to suppress Amanda Torres' purported inculpatory statements to Yakima Sheriff Deputy Sergio Reyna. During the hearing, Deputy Reyna and Amanda Torres testified.

After the testimony at the CrR 3.5 hearing, Amanda Torres argued that she received no *Miranda* warnings before speaking to Sheriff Deputy Sergio Reyna in the patrol car. Torres did not assert any violation of her Fourth Amendment rights. After the hearing, the trial court adjudged Amanda Torres' statements admissible. The court found Deputy Reyna more credible than Amanda Torres, Reyna provided *Miranda* warnings, and Torres spoke voluntarily to Reyna. Our record lacks any written findings of fact resulting from the CrR 3.5 hearing.

During trial, Amanda Torres testified that, as she lay in bed incompletely asleep, Sheriff Deputy Sergio Reyna grasped her arm and ushered her to the deputy's patrol car.

Torres did not know where Reyna found her identification card. Torres denied damaging the train. She repudiated telling Reyna that she vandalized the train and that she drank with friends at the rail yard.

Amanda Torres requested a jury instruction defining the term "operating mechanism" as used in RCW 81.60.080, a term found in the crime of sabotaging rolling stock. Torres wished to argue that windows do not constitute an "operating mechanism." The trial court responded:

> I think that the term operating mechanism is testimony as to the gages [sic] being operating mechanism. There's also testimony that the windows are in a—a necessary part of the locomotive and—and I think you are right, I don't think the jury's going to decide this case on the basis of whether the windows are an operating mechanism or not. But—all right, do you have other exceptions?

RP at 214-15. The court instructed the jury:

> A person commits the crime of Sabotaging Rolling Stock when he or she willfully or maliciously, with intent to injure the owner thereof, in any manner interferes with any part of the operating mechanism of any locomotive used or capable of being used by any railroad or railway company in this state.

Clerk's Papers (CP) at 14.

During closing argument, the State mentioned that someone destroyed the gauges as well as the "special windows." RP at 232-33. Later in the State's argument, the parties and court interchanged:

7

[State]: In any manner interfere with any part of the operating mechanism. You heard testimony from Mr. Shreves and Mr. Didelius that the glass of the window are special glass or window. These are glass and windows that you cannot just go to a Home Depot or a Lowe's to find a replacement.

[Torres' Attorney]: I'm sorry, I thought the Court ruled that operating mechanism meant something different from what Counsel's talking about.

THE COURT: Oh, I didn't rule.

[Torres' Attorney]: Okay. I'm sorry, I misunderstood. Thank you.

RP at 234-35.

Defense counsel, in his closing argument, reasoned that windows were not an operating mechanism. In rebuttal argument, the prosecutor stressed that the windows were an operating mechanism.

The jury found Amanda Torres guilty on all three counts: sabotaging rolling stock, second degree malicious mischief, and second degree burglary. The trial court sentenced her to 13 days' incarceration for each count, running concurrently. Torres' sentence also required, as a condition of community custody, that she:

> Report no later than the next business day after sentencing or release from jail to a Washington State approved alcohol/drug assessment facility for evaluation. Cooperate fully with the facility and immediately enter into and complete any recommended treat program by the end of supervision.
> . . . If a treatment program is not recommended, promptly complete Alcohol/Drug Information School.

CP at 46. The judgment and sentence imposed $15,471.22 in legal financial obligations, including $14,671.22 in restitution. The amount of restitution, however, is crossed out

8

with an accompanying handwritten message: "To be set at restitution hearing." CP at 46.

At the later hearing, the court ordered Amanda Torres to pay $9,943.01 in restitution.

LAW AND ANALYSIS

*Issue 1: Whether Amanda Torres' inculpatory comments to Deputy Sergio Reyna should have been suppressed because Reyna violated Torres' constitutional right to privacy by entering the house without a warrant and seizing her?*

*Answer 1: We refuse to address this question because Torres did not assert Fourth Amendment rights before the trial court and any error is not manifest constitutional error because we lack a sufficient factual record to address the merits of Torres' argument.*

Amanda Torres contends Yakima County Sheriff Deputy Sergio Reyna's warrantless entry into her home violated her rights under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution. She argues that under the common authority doctrine the young female's consent did not legitimize Deputy Reyna's warrantless entry into Torres' home. Torres also argues that the deputy violated her constitutional right against warrantless seizure when he physically escorted her from her home and placed her in his patrol car for interrogation. Although trial counsel did not raise unlawful entry and seizure as a basis for excluding Torres' statements, she argues the error is reviewable as manifest constitutional error or proves ineffective assistance of her counsel. If we agreed with Amanda Torres, we would suppress all evidence gathered after the arrest.

The State justifies Sheriff Deputy Sergio Reyna's warrantless entry into the residence on the invitation and consent of the young female. The State also denies that Deputy Reyna seized Amanda Torres when touching her elbow and escorting her from her bedroom to his patrol car. The State further asks that we refuse to entertain the Fourth Amendment argument because of Torres' failure to assert the argument before the trial court.

As Amanda Torres admits in her brief, she did not raise a Fourth Amendment challenge below. The trial court held a CrR 3.5 hearing to determine whether to suppress Torres' statements to Sheriff Deputy Sergio Reyna. Her closing statement at the hearing focused on whether Reyna read Torres her *Miranda* rights, not the constitutionality of the entry into the home and the detainment of Torres.

A party may not generally raise a new argument on appeal that the party did not present to the trial court. RAP 2.5; *In re Det. of Ambers*, 160 Wn.2d 543, 557 n.6, 158 P.3d 1144 (2007). A party must inform the court of the rules of law it wishes the court to apply and afford the trial court an opportunity to correct any error. *Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983). We may decline to consider an issue inadequately argued below. *International Association of Fire Fighters, Local 46 v. City of Everett*, 146 Wn.2d 29, 36-37, 42 P.3d 1265 (2002).

RAP 2.5(a) formalizes a fundamental principle of appellate review. The first sentence of the rule reads:

**(a) Errors Raised for First Time on Review**. The appellate court may refuse to review any claim of error which was not raised in the trial court.

No procedural principle is more familiar than that a constitutional right, or a right of any other sort, may be forfeited in criminal cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it. *United States v. Olano*, 507 U.S. 725, 731, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993); *Yakus v. United States*, 321 U.S. 414, 444, 64 S. Ct. 660, 88 L. Ed. 834 (1944).

Sound reasoning lies behind the requirement that arguments be first asserted at trial. The prerequisite affords the trial court an opportunity to rule correctly on a matter before it can be presented on appeal. *State v. Strine*, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013). There is great potential for abuse when a party does not raise an issue below because a party so situated could simply lie back, not allowing the trial court to avoid the potential prejudice, gamble on the verdict, and then seek a new trial on appeal. *State v. Weber*, 159 Wn.2d 252, 271-72, 149 P.3d 646 (2006); *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). The theory of preservation by timely objection also addresses several other concerns. The rule serves the goal of judicial economy by enabling trial courts to correct mistakes and thereby obviate the needless expense of appellate review and further trials, facilitates appellate review by ensuring that a complete record of the issues will be available, and prevents adversarial unfairness by ensuring that the prevailing party is not deprived of victory by claimed errors that he had no opportunity to

11

address. *State v. Strine*, 176 Wn.2d at 749-50 (2013); *see State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988).

Countervailing policies support allowing an argument to be raised for the first time on appeal. For this reason, RAP 2.5(a) contains a number of exceptions. RAP 2.5(a)(3) allows an appellant to raise for the first time "manifest error affecting a constitutional right," an exception on which a criminal appellant commonly relies. Constitutional errors are treated specially under RAP 2.5(a) because they often result in serious injustice to the accused and may adversely affect public perceptions of the fairness and integrity of judicial proceedings. *State v. Scott*, 110 Wn.2d at 686-87. Prohibiting all constitutional errors from being raised for the first time on appeal would result in unjust imprisonment. 2A KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE RAP 2.5 at 218 (8th ed. 2014).

Amanda Torres' warrantless entry and warrantless seizure issues implicate constitutional rights. We must, therefore, determine whether her arguments address a manifest error.

Washington courts and even decisions internally have announced differing formulations for "manifest error." First, a manifest error is one "truly of constitutional magnitude." *State v. Scott*, 110 Wn.2d at 688 (1988). Second, perhaps perverting the term "manifest," some decisions emphasize prejudice, not obviousness. The defendant must identify a constitutional error and show how, in the context of the trial, the alleged

12

error actually affected the defendant's rights. It is this showing of actual prejudice that makes the error "manifest," allowing appellate review. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009); *State v. Scott*, 110 Wn.2d at 688; *State v. Lynn*, 67 Wn. App. 339, 346, 835 P.2d 251 (1992). A third and important formulation for purposes of this appeal is the facts necessary to adjudicate the claimed error must be in the record on appeal. *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995); *State v. Riley*, 121 Wn.2d 22, 31, 846 P.2d 1365 (1993). If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest. *State v. Riley*, 121 Wn.2d at 31.

Our record lacks key facts for determining the constitutionality of Deputy Sergio Reyna's entrance into the Wapato residence. Also, Amanda Torres' version of events sometimes diverges from Reyna's account of events and no trier of fact has resolved this inconsistency in stories. The trial court entered no findings of fact relevant to the question of whether Deputy Reyna violated Torres' Fourth Amendment privileges. Critical unresolved facts include the identity of the young lady answering the knock on the front door, the youngish woman's role in the home, Amanda Torres' standing in the residence, whether Torres and the young lady held equal rights to control the premises or whether the other girl possessed subordinate rights, the words spoken by Sergio Reyna to Amanda Torres before escorting Torres from her bedroom, the manner and extent to which Reyna touched the body of Torres, the degree of force asserted by Reyna in his

13

interaction with Torres, and whether a reasonable person would consider herself free to disobey Reyna's instructions to follow him.

Resolution of some of the factual questions posed looms important under the pertinent law. In search and seizure cases involving cohabitants, courts apply the common authority rule. *State v. Morse*, 156 Wn.2d 1, 7, 123 P.3d 832 (2005). This rule provides the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared. *United States v. Matlock*, 415 U.S. 164, 170, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974); *State v. Leach*, 113 Wn.2d 735, 738-39, 782 P.2d 1035 (1989). One with equal or lesser control over premises does not have authority to consent for those who are present and have equal or greater control. *State v. Morse*, 156 Wn.2d at 4-5. A temporary guest does not have authority to consent to a search of private areas of a host's home while the host is present. *State v. Morse*, 156 Wn.2d at 8.

Whether a law enforcement officer seized a person under the Fourth Amendment is a mixed question of law and fact. *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997). What the police said and did and what the defendant said and did are questions of fact. *State v. Howerton*, 187 Wn. App. 357, 364, 348 P.3d 781, *review denied*, 184 Wn.2d 1011, 360 P.3d 818 (2015). A warrantless seizure is presumed unconstitutional under the Fourth Amendment. *State v. Acrey*, 148 Wn.2d 738, 746, 64 P.3d 594 (2003). A seizure occurs when, in view of all the circumstances surrounding the incident, a

14

reasonable person would have believed that he was not free to leave. *State v. Young*, 135 Wn.2d 498, 510, 957 P.2d 681 (1998).

We note that the broad authority granted under RAP 12.2 and case law allows this court to remand to the trial court for an evidentiary hearing and factual findings if necessary to resolve an issue on appeal. *State v. Brown*, 30 Wn. App. 344, 633 P.2d 1351 (1981), *overruled on other grounds by State v. Commodore*, 38 Wn. App. 244, 684 P.2d 1364 (1984); *State v. Mitchell*, 2 Wn. App. 943, 472 P.2d 629 (1970), *overruled on other grounds in State v. Braithwaite*, 92 Wn.2d 624, 600 P.2d 1260 (1979), which in turn was *overruled by State v. Hennings*, 100 Wn.2d 379, 670 P.2d 256 (1983). Nevertheless, the State in *Brown* or *Mitchell* did not question the presence of manifest constitutional error because of a failure to assert a contention before the respective trial courts. We do not consider ourselves free to remand for an additional hearing on an issue not argued below when the defendant fails to show manifest constitutional error because of an insufficient record. Amanda Torres' filing of a personal restraint petition would better serve adjudication of her Fourth Amendment rights.

Amanda Torres also argues that her trial counsel was ineffective for failure to seek suppression of any confession on Fourth Amendment grounds. A claim of ineffective assistance of counsel requires a showing that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). Deficient performance occurs when counsel's

15

performance falls below an objective standard of reasonableness. *State v. Stenson*, 132

Wn.2d 668, 705, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008, 118 S. Ct. 1193, 140

L. Ed. 2d 323 (1998). This court presumes that counsel was effective. *Strickland v.*

*Washington*, 466 U.S. 668, 689-90, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984);

*McFarland*, 127 Wn.2d at 335.

We decline to address whether Amanda Torres' trial counsel violated the standard

of care because we can decide the appeal based on the failure to show prejudice. If one

prong of the test fails, we need not address the remaining prong. *State v. Hendrickson*,

129 Wn.2d 61, 78, 917 P.2d 563 (1996). Prejudice occurs when, but for the deficient

performance, the outcome would have differed. *In re Pers. Restraint of Pirtle*, 136

Wn.2d 467, 487, 965 P.2d 593 (1998); *McFarland*, 127 Wn.2d at 337. In order to

establish actual prejudice, Torres must show that the trial court likely would have granted

a motion to suppress her confession based on an unlawful entry into the home and seizure

of her person. *State v. Hamilton*, 179 Wn. App. 870, 882, 320 P.3d 142 (2014). As

analyzed previously, we lack sufficient facts to determine whether the trial court would

have granted a motion to suppress.

*Issue 2: Did the trial court err in refusing to instruct the jury that windows were*

*not part of the operating mechanism of the locomotive?*

*Answer 2: Yes.*

16

Amanda Torres contends that the trial court erred in denying her request for a clarifying instruction that locomotive windows do not qualify as part of the operating mechanism of a locomotive under RCW 81.60.080(1). She also argues that the prosecutor committed misconduct by misleading the jury to believe windows constitute operating mechanisms. The State responds that the trial court committed no error because the trial court provided sufficient instructions. According to the State, windows qualify as an operating mechanism since the train cannot legally operate without the window mechanisms. Amanda Torres' assignment of error concerns only one of her three convictions, sabotaging rolling stock.

Amanda Torres' assignment of error raises a legal question of statutory construction. We must decide as a matter of law whether a jury may convict one for sabotaging rolling stock if one shatters locomotive windows.

RCW 81.60.080(1) criminalizes sabotaging rolling stock. The statute declares:

> Any person or persons who shall willfully or maliciously, with intent to injure or deprive the owner thereof, *take, steal, remove, change, add to, alter, or in any manner interfere* with any journal bearing, brass, waste, packing, triple valve, pressure cock, brake, air hose, *or any other part of the operating mechanism of any locomotive*, engine, tender, coach, car, caboose, or motor car *used or capable of being used* by any railroad or railway company in this state, is guilty of a class C felony, and upon conviction thereof shall be punished by imprisonment in a state correctional facility for not more than five years, or by a fine not exceeding one thousand dollars, or by both such fine and imprisonment.

17

(Emphasis added.) We must decide whether ballistic windows fall within the category of "operating mechanisms" within the meaning of the statute. This court faces a novel issue involving an obscure criminal statute never before cited in a court opinion. We compliment the State for unearthing the archaeological find catalogued in a title other than Titles 9 or 9A RCW. We cannot find guidance in foreign law because no other state criminalizes "sabotaging rolling stock." No criminal case discusses the definition of a train's or locomotive's "operating mechanism." So we go boldly forward where no man or woman has gone before.

Amanda Torres wishes this court to interpret "operating mechanism" to mean locomotive parts that make the train move, or, with braking features, slow down and stop. The State interprets "operating mechanism" to mean any portion of a train that, when damaged, prevents the owner from operating the train in compliance with federal regulations. After dissecting and magnifying RCW 81.60.080(1), we agree with Amanda Torres that windows, as a matter of law, are not operating mechanisms. Therefore, the trial court should have instructed the jury that the jury could not consider windows as operating mechanisms. We doubt that a prosecutor engages in misconduct when he or she argues an interpretation of a statute consistent with a trial court ruling. Nevertheless, because we vacate the conviction on inadequate jury instructions, we do not address whether the prosecution engaged in misconduct when arguing that windows are operating mechanisms.

18

The court's duty in statutory interpretation is to discern and implement the legislature's intent. *Lowy v. PeaceHealth*, 174 Wn.2d 769, 779, 280 P.3d 1078 (2012). In so doing, we rely on many tested, commonsensical, and intelligent principles to divine the meaning of the statute, principles employed when interpreting other important and even sacred texts. We rely on legislative history, a lay dictionary, a technical railroad dictionary, other words in the statute, and the whole of the statute.

The Washington Legislature adopted RCW 81.60.080 in 1941. S.B. 201, 27th Leg., Reg. Sess. (Wash. 1941). The proposed bill initially read: "Any person or persons who shall willfully or maliciously, with intent to injure or deprive the owner thereof, take, steal, remove, change, add to, alter, or in any manner interfere with any journal bearing, brass, waste, packing, triple valve, pressure cock, brake, air hose *or any other part or attachment* . . . ." (Emphasis added.) During the legislative process, the Senate Standing Committee recommended substituting the language "any other part of the operating mechanism" in lieu of "any other part or attachment." SENATE JOURNAL, 27th Leg., Reg. Sess., at 213 (Wash. 1941). The Washington Senate incorporated the recommended amendment and the bill became law with the new "operating mechanism" language. S.B. 201, 27th Leg., Reg. Sess. (Wash. 1941). With this history, we know that the legislature did not intend the statute to apply broadly to any locomotive part or attachment.

19

To determine the meaning of a two-word phrase, such as "operating mechanism," this court may examine the dictionary definition of each individual word. *State v. Kintz*, 169 Wn.2d 537, 548, 238 P.3d 470 (2010). The dictionary defines "operating" as engaged in some form of operation. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1581 (1993). The same dictionary defines "mechanism" as a piece of machinery, a structure of working parts functioning together to produce an effect. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1401 (1993). These broad definitions suggest a locomotive's operating mechanisms work together to accomplish the purpose of the locomotive, to propel and stop movement of the train. Even if a window is a mechanism, a window is not used to operate a train. Even if a window is necessary for the safe operation of a train, it is not used to run a train. The locomotive may still move if one removes its windows.

The parts of a train catalogued in RCW 81.60.080 are: "journal bearing, brass, waste, packing, triple valve, pressure cock, brake, air hose, or any other part of the operating mechanism of any locomotive." A classic rule of statutory construction, expressio unius est exclusio alterius, is Latin for when a statute specifically designates the things on which it operates, there is an inference that the legislature intended all omissions. *State v. LG Electronics, Inc.*, 186 Wn.2d 1, 9, 375 P.3d 636 (2016). Thus, we must assume that the legislature meant to exclude portions of the locomotive covered under RCW 81.60.080. Under the principle of noscitur a sociis, the meaning of words

20

may be indicated or controlled by those with which they are associated. *State v. Jackson*, 137 Wn.2d 712, 729, 976 P.2d 1229 (1999); *In re Marriage of Tahat*, 182 Wn. App. 655, 671, 334 P.3d 1131 (2014). Thus, an operating mechanism within the meaning of the statute should echo the nature of the discrete portions of the locomotive enumerated.

Terms used in the statute for train parts are unique to railroading and may also be unique to the date of the statute's adoption. When a technical term is used in its technical field, the term should be given its technical meaning by using a technical rather than a general purpose dictionary to resolve the term's definition. *Tingey v. Haisch*, 159 Wn.2d 652, 658, 152 P.3d 1020 (2007). A Google search for locomotive terms brings one first to the American Railway Association's *Locomotive Cyclopedia of American Practice* (6th ed. 1922). Amanda Torres also discovered this cyclopedia of terms. In her brief, she lists the definitions of terms, listed in RCW 81.60.080, as found in the cyclopedia.

We note, as Amanda Torres observes, that all of the terms named in RCW 81.60.080 involve a moving mechanism that facilitates train movement or stopping. The cyclopedia awkwardly defines a "journal bearing" as a "block of metal, usually some kind of Brass or Bronze, which see, in contact with a journal, on which the load rests. In locomotive building the term when unqualified means an engine or truck axle journal bearing." *Locomotive Cyclopedia of American Practice* at 56. A "journal" is "[t]hat part of an axle or shaft on which the journal bearing or brass rests." Locomotive Cyclopedia of American Practice at 56. "Brass" means an "alloy of copper and zinc, commonly used

21

to designate a journal bearing." *Locomotive Cyclopedia of American Practice* at 23. "Waste" is defined as "[t]he spoiled bobbins of cotton or woolen mills, used for wiping machinery and for JOURNAL PACKING." *Locomotive Cyclopedia of American Practice* at 96. "Packing" is a "device or arrangement for making a steam-tight fitting on the piston rod and valve stem where they pass through their stuffing boxes on cylinder and steam chest, respectively. Also used on air pump piston rods and throttle rods." *Locomotive Cyclopedia of American Practice* at 64. "Journal packing" is "[w]aste, wool or other fibrous material saturated with oil or grease, with which a journal box is filled to lubricate the journal." *Locomotive Cyclopedia of American Practice* at 57. A "triple valve" is an "air brake." *Locomotive Cyclopedia of American Practice* at 91. The cyclopedia does not define a "pressure cock" but defines a "cock" as "rotary valve." *Locomotive Cyclopedia of American Practice* at 29. Thus, a "pressure cock" should be a "pressure valve." An "air hose" is an "air brake hose," which is "[f]lexible tubes made of alternate layers of rubber and canvas or metal." *Locomotive Cyclopedia of American Practice* at 11. All of these parts are critical to the movement of the locomotive.

The State criticizes 21st century use of a 1922 cyclopedia of locomotive terms. Nevertheless, to discern the intent of an early 20th century legislature, we best use a 1922 cyclopedia. When consulting a dictionary, a court should use a dictionary in use at the time of the enactment. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010); *State v. Leslie*, 204 Or. App. 715, 719, 132 P.3d 37 (2006): *Asbury v. Lombardi*,

22

846 S.W.2d 196, 201 (Mo. 1993) (en banc). Also, the State presents no contravening

definitions of the terms used in RCW 81.60.080.

We ascertain the legislature's intent using the plain meaning imparted by the text

of the provision and that of any related provisions. *Department of Ecology v. Campbell

& Gwinn, LLC*, 146 Wn.2d 1, 11-12, 43 P.3d 4 (2002). So we focus briefly on the verbs

used in RCW 81.60.080. The statute punishes persons who "*take, steal, remove, change,

add to, alter, or in any manner interfere* with any journal bearing, brass, waste, packing,

triple valve, pressure cock, brake, air hose, *or any other part of the operating mechanism

of any locomotive*." The statute does not focus on damage to the locomotive but with

removal or altering a part so as to interfere with an operating mechanism. These verbs

suggest that the legislature sought to prohibit vandalism that impedes movement of the

train.

The State argues that the legislature intended "operating mechanisms" in

RCW 81.60.080 to refer to parts needed to operate the train in a legal manner so as to

benefit the owner. We find no hint in the statute that suggests the legislature meant legal

operation of the locomotive. We are unsure if the federal regulations that the State cites

existed in 1941 when the Washington Legislature enacted the criminal statute. We do not

know all of the parts of the train now required by federal regulations to be present. We

worry that an extensive list of such compulsory parts would in effect render vandalism to

23

any part of the train a violation of the statute, when the legislature did not wish such a broad interpretation.

Due process requires that jury instructions (1) allow the parties to argue all theories of their respective cases supported by sufficient evidence, (2) fully instruct the jury on the defense theory, (3) inform the jury of the applicable law, and (4) give the jury discretion to decide questions of fact. *State v. Koch*, 157 Wn. App. 20, 33, 237 P.3d 287 (2010). In determining whether a trial was fair and whether the defendant suffered prejudice, the court should look to the trial irregularity and determine whether it may have influenced the jury. *State v. Davenport*, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984).

Amanda Torres requested a jury instruction to fully inform the jury of the applicable law. The windows and pressure gauges were the only damaged parts of the train that the State argued as operating mechanisms. As windows are not operating mechanisms, the trial court's failure to properly instruct the jury likely misled the jury in a manner prejudicial to Torres. Thus, we reverse Torres' conviction for sabotage of rolling stock.

The State presented testimony of damage to the glass tops of air gauges. One witness testified that an air gauge is an operating mechanism. The testimony was unclear as to whether the damage precluded the functioning of the gauge and the operation of the train. Nevertheless, the jury could have found that, based on the testimony, Amanda

24

Torres changed or interfered in an operating mechanism by reason of vandalizing the gauge. Therefore, we remand for a new trial with proper jury instructions.

*Issue 3: Whether the trial court erred when sentencing Amanda Torres?*

*Answer 3: We need not answer this question because we remand for other reasons and a new sentencing hearing will be needed.*

Amanda Torres requests a remand to the trial court for clarification that the sentence's community custody condition and any recommended treatment must be limited to alcohol and not include drug assessment or treatment. Although the State concedes no error, the State, in the interest of judicial economy, agrees that the most expeditious method to address this question is to remand this to the trial court for clarification. Since we remand for resentencing anyway, we direct the court to clarify the community custody condition.

Amanda Torres requests this court remand for correction of the judgment and sentence to reflect the correct amount of legal financial obligations. Torres' judgment and sentence, entered at the sentencing hearing, lists a total of $15,471.22 in financial obligations, including $14,671.22 in restitution. Nevertheless, the trial court did not determine restitution at sentencing, but rather set a later restitution hearing. The subsequent hearing resulted in an order for $9,943.01 in restitution. The $15,471.22 judgment thus needs correction. The State agrees that the judgment and sentence requires correction.

25

No. 33933-5-III
*State v. Torres*

Since Amanda Torres prevails in part on appeal, we deny the State an award of costs on appeal.

CONCLUSIONS

We decline to address Amanda Torres' Fourth Amendment challenges to the entry of her home and her seizure because of a lack of manifest constitutional error. Therefore, we affirm Torres' convictions for second degree malicious mischief and second degree burglary. Because of misleading jury instructions, we reverse Torres' conviction for sabotage of rolling stock and remand for a new trial on this charge. At the completion of proceedings regarding the sabotage charge, the trial court shall resentence Torres in light of instructions in this opinion.

Fearing, C.J.

WE CONCUR:

Siddoway, J.                    Lawrence-Berrey, J.